IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SHAHRYAR OVEISSI, <br> SHARAREH OVEISSI, <br> and <br> HOSSEIN OVEISSI <br><br><br> Plaintiffs, <br><br> v. <br><br> THE ISLAMIC REPUBLIC OF IRAN, <br><br> SEYED ALI HUSSEINI KHAMENEI, <br> Supreme Leader of Iran <br><br> and <br><br> IRANIAN MINISTRY OF INTELLIGENCE <br> AND SECURITY <br><br> c/o Ministry of Foreign Affairs <br> Khomeini Avenue, <br> United Nations Street <br> Tehran, Iran <br><br> Defendants. | <br><br><br><br><br><br> <u>Case #:  1:19-cv-2846</u> |

## COMPLAINT

1.  Plaintiffs, Mr. Shahryar Oveissi, Ms. Sharareh Oveissi and Mr. Hossein Oveissi
    (collectively, the "Oveissi family" or "Plaintiffs") bring suit against Defendants the
    Islamic Republic of Iran ("IRAN"), Iranian Supreme Leader Seyed Ali Husseini
    Khamenei, and the Iranian Ministry of Intelligence and Security ("MOIS") (collectively,
    "Iran" or "Iranian Government" or "Defendants") under the Foreign Sovereign
    Immunities Act, 28 U.S.C. §§ 1602 *et seq.* ("FSIA") and the Torture Victim Protection
    Act of 1991 ("TVPA"), 1992 Enacted H.R. 2092, 102 Enacted H.R. 2092, 106 Stat. 73
    for severe personal injuries and other irreparable harm suffered as a result of Defendants'
    unlawful acts of terrorism, extrajudicial killing, and other torts against Plaintiffs and
    against General Gholam Ali Oveissi ("General Oveissi"), the husband and father of the
    Plaintiffs.

2.  Plaintiffs, Mr. Shahryar Oveissi, Ms. Sharareh Oveissi, and Mr. Hossein Oveissi bring
    this complaint in order to recover for the actions of the Iranian government in committing

the extrajudicial killing of General Gholam Ali Oveissi. General Oveissi, a four-star

general of the Iranian Imperial Army under the former Shah of Iran, was shot in the head

and killed by Defendant's agents while walking down the Rue de Passy in Paris, France.

Plaintiffs bring this action under section 1605A of the Foreign Sovereign Immunities Act,

which provides for private causes of action against a state sponsor of terrorism, in this

case the Islamic Republic of Iran, for personal injury and death caused by an act of terror

and extrajudicial killing. Also, Plaintiffs bring this action under the Torture Victim

Protection Act for the extrajudicial killing of General Oveissi.

3. There have been two other cases filed by other family members of Mr. General Oveissi

which ruling in favor of the Plaintiff; case numbers 1:03-cv-01197-RCL and 1:11-cv-

00849-RCL.


**JURISDICTION AND VENUE**

4. This Court has jurisdiction over this matter and over Defendants pursuant to 28 U.S.C. §§

1330(a), 1330(b), 1331, 1332(a)(2) and 1605A(a)(1), which create subject matter

jurisdiction and personal jurisdiction for civil actions for personal injuries against State

Sponsors of Terrorism and their officials, employees, and agents.

5. 28 U.S.C. § 1605A(c) provides a federal private right of action against a foreign state that

is or was a State Sponsor of Terrorism, and also against any official, employee or agent

of that foreign state while acting within the scope of his or her office, employment or

agency, for personal injury and related torts.

6. Venue is proper in this district pursuant to 28 U.S.C. § 1391(f).


**PARTIES**

7. Plaintiff, Mr. Shahryar Oveissi ("Shahryar"), is the son of General Gholam Ali Oveissi.

Shahryar was born in Livingston, New Jersey on June 18, 1979. Shahryar Oveissi is and

was a United States citizen at all times material to this matter and is a domiciliary and

resident of Connecticut. Shahryar has a professional career and his employment called for

his spending extensive periods of time in the Persian Gulf until 2019. While in the

Persian Gulf, he was under constant surveillance by the Iranian government. As of the

date of this Complaint, his properties have been seized by Iran and the income from those properties have not been transferred to Shahryar.

8. Plaintiff, Ms. Sharareh Oveissi (Sharareh), is the widow of General Gholam Ali Oveissi. Sharareh was born in Tehran, Iran and married General Oveissi in Iran in the early 1970s. In 1978, Sharareh (who at the time was pregnant with Plaintiff Shahryar Oveissi), General Oveissi, and the couple's four-and-a-half-year-old son, Plaintiff Hossein Oveissi, were forced to flee from Iran at the height of the uprising against the Shah with only a few suitcases. The Oveissi family was granted political asylum in the United States at this time and began residing in the United States. The Oveissi family purchased a home in Greenwich, CT in 1980, which would serve as their primary residence. After the untimely death of her husband, Sharareh returned to the United States permanently with her two sons. Sharareh Oveissi became a naturalized United States citizen on June 1, 1990. Sharareh is a domiciliary and resident of Connecticut. Her properties in Iran and the joint estate of General Oveissi and Sharareh have been taken in possession by the Iranian government.

9. Plaintiff, Mr. Hossein Oveissi ("Hossein"), is the son of General Gholam Ali Oveissi. Hossein was born in Tehran, Iran on May 3, 1974, prior to his family fleeing persecution in Iran. Hossein has resided in the United States since 1980 and is a United States citizen. Hossein is a domiciliary and resident of Connecticut. Hossein is the rightful possessor of several properties in Iran that were deeded to him by his father and that are currently in the possession of the Iranian government.

10. Defendant the Islamic Republic of Iran ("IRAN") is a foreign state. Iran is a theocratic republic with an elected head of government and a head of state—the Ayatollah or Supreme Leader—appointed for life by a council of theologians. The Supreme Leader controls the Guardian Council of the Constitution, which interprets the Iranian Constitution, supervises elections (including by determining which candidates may run), and exercises significant influence over the legislative, executive, and judicial branches of government, as well as the military and Iranian Revolutionary Guard Corps.

11. The Iranian Ministry of Intelligence and Security ("MOIS") is the primary intelligence agency of the Islamic Republic of Iran and a member of the Iran Intelligence Community. MOIS uses all mean at its disposal to protect the Islamic Revolution of Iran, utilizing

such methods as infiltrating internal opposition groups, monitoring domestic threats and expatriate dissent, arresting alleged spies and dissidents, exposing conspiracies deemed threatening, and maintaining liaison with other foreign intelligence agencies as well as with organizations that protect the Islamic Republic's interests around the world. According to Iran's constitution, all organizations must share information with MOIS. The ministry oversees all covert operations.[1]

12. Defendant Seyed Ali Hosseini Khamenei has been Iran's Supreme Leader since 1989. He was previously the President of Iran from 1981 to 1989. As Supreme Leader, Khamenei is the head of state of Iran and the commander-in-chief of its armed forces. For this reason, he is considered the most powerful political authority in the country. As Supreme Leader, Khamenei can issue decrees and make the final decisions on the main policies of the government in fields such as economy, the environment, foreign policy, and national planning within Iran. Khamenei has direct control over the executive, legislative and judicial branches of government, as well as the military and media. President Donald J. Trump imposed secondary sanctions on Ali Khamenei stating that: "in light of the actions of the Government of Iran…to promote international terrorism…hereby order: Section 1. (a) All property and interests in property that are in the United States, that hereafter come within the United States, or that are or hereafter come within the possession or control of any United States person of the following persons are blocked and may not be transferred, paid, exported, withdrawn, or otherwise dealt in: (i) the Supreme Leader of the Islamic Republic of Iran and the Iranian Supreme Leader's Office (SLO)". Exec. Order No. 13876, 84 Fed. Reg. 30574 (June. 26, 2019).

13. Defendants the Islamic Republic of Iran, Supreme Leader Seyed Ali Hosseini Khamenei, and the Iranian Ministry of Intelligence and Security, at all times material to this matter were and are entities designated by federal statute as state sponsors of terrorism and are not immune to litigation.

**STATEMENT OF FACTS**

---

1. Although Islamist hard-liners in Iran are in charge of the ministry under the guidance of Supreme Leader Ayatollah Ali Khamenei, the organization encompasses a mixture of political ideologies. The Library of Congress, *Iran's Ministry of Intelligence and Security: A Profile*, https://fas.org/irp/world/iran/mois-loc.pdf (last visited Aug. 27, 2019).

**14.** Gholam Ali Oveissi ("General Oveissi") was a prominent figure in the government of the Shah of Iran, who rose to the rank of General of the Army. He was a "four-star general in Iran's armed forces," and was closely linked with the ruling Shah of Iran prior to the Shah's overthrow during the Iranian revolution of 1979.[2]

**15.** After the revolution of 1979, which saw the rise of Ayatollah Khomeini and the transformation of Iran into an Islamic state, the Islamic Republic of Iran (IRAN)[3] began state-sponsored terrorism and engaged in a government-sponsored program of extrajudicial killings of Iranian ex-patriates, principally in Europe.

**16.** Iran has sponsored and orchestrated terrorist activities through defendant the Iranian Ministry of Intelligence and Security (MOIS), and Iranian agents founded a political organization known as Hezbollah, or "Party of God," which, under the direction of Iran and MOIS, engaged in terrorist activities outside the Middle East using the *nom-de-guerre* "Islamic Jihad."[4]

**17.** Iran, through MOIS, provided logical support and training that were crucial to Hezbollah's ability to carry out assassinations, including those undertaken as "Islamic Jihad."[5]

**18.** Islamic Jihad was responsible for the murder of General Gholam Ali Oveissi in Paris, France, and the agents carrying out the assassination were funded and controlled by defendant Iran through defendant MOIS.[6]

**19.** Contemporary accounts of General Oveissi describe him as one of the most powerful Iranian generals, and state that he was the commander of the imperial Iranian army.[7]

**20.** General Oveissi "was outspoken in his opposition to Iran's revolutionary government" and he "advocated secular democracy and favored cooperation with the United States."[8]

---

2. *Amir Reza Oveissi v. Islamic Republic of Iran (Oveissi I)*, 498 F. Supp. 2d 268, 274-275 (D.C. Cir. 2007).

3. Defendant Iran is a foreign state and has been designated as a state sponsor of terrorism pursuant to section 6(j), of the Export Administration Act of 1979, 50 U.S.C. §1405(j) continuously since January 19, 1984. *Oveissi I*, 498 F. Supp. 2d at 272 (D.C. Cir. 2007) (quoting *Weinstein v. Islamic Republic of Iran*, 184 F. Supp. 2d 13, 20 (D.D.C. 2002) (Lamberth, J.)).

4. *Oveissi I*, 498 F. Supp. at 272-273.

5. *Id.* at 273.

6. *Id.*

7. In support of this position, plaintiffs submit a 2008 report from the Iran Human Rights Documentation Center (IHRDC), an independent organization whose goal is to "establish a comprehensive and objective historical record of the human rights situation in the Islamic Republic of Iran since the 1979 revolution." *See* Iran Human Rights Documentation Center, *No Safe Haven: Iran's Global Assassination Campaign* (2008), *available at* https://iranhrdc.org/no-safe-haven-irans-global-assassination-campaign ("IHRDC Report").

**21.** General Oveissi also served as Minister of Labor and Social Affairs in the short-lived 1978 military government of Prime Minister Gholam Reza Azhari.[9]

**22.** Shortly before the Iranian revolution in January 1979, General Oveissi and his family fled to the United States. The Oveissi family was granted political asylum in the United States due to General Oveissi's status within the former Iranian government and the threat of danger they were under by the newly established Iranian regime. The Oveissi family purchased a home in Connecticut in 1980, thereby establishing their permanent residence in the United States. However, General Oveissi was primarily residing in Paris and his family was visiting him frequently from the United States. General Oveissi was in Paris to join forces against the newly established Iranian Regime. During this time, Plaintiff Sharareh Oveissi travelled back and forth from France and the United States with the couple's two young sons. The family's primary residence remained in Connecticut.

**23.** Following his flight from Iran and the birth of his son, Shahryar, General Oveissi became extremely close to his family and young sons as he was often at home with them while in Paris.[10] While in Paris during these years the family frequently moved to different apartments in an attempt to hide themselves from Iranian agents. However, the family's stay in Paris was cut short after General Oveissi was gunned down on a busy street in Paris on February 8, 1984.

**24.** On or about February 8, 1984, agents of the IRAN and MOIS shot and killed General Oveissi in the head as he walked down the Rue de Passy in Paris, France.[11]

**25.** Defendant, the Islamic Republic of Iran has admitted that its agents, employed by MOIS carried out this attack. Islamic Jihad, a relatively-unknown group at the time, immediately claimed responsibility for the assassination.

**26.** The day after General Oveissi's murder, the Government of Iran reportedly characterized the killings as a "revolutionary execution." Spokespersons for several Iranian exile

---

8. *Oveissi I*, 498 F. Supp. at 274.

9. Iran Human Rights Documentation Center, *No Safe Haven: Iran's Global Assassination Campaign* (2008), *available at* https://iranhrdc.org/no-safe-haven-irans-global-assassination-campaign ("IHRDC Report").

10. *Oveissi I*, 498 F. Supp. at 274.

11. John Vinocur, *Exiled Iranian General is Killed with Brother by Gunmen in Paris*, THE NEW YORK TIMES (Feb. 8, 1984), https://www.nytimes.com/1984/02/08/world/exiled-iranian-general-is-killed-with-brother-by-gunmen-in-paris.html.

organizations opposing the Islamic Republic publicly accused the Iranian government of ordering the killings in an attempt to intimidate opposition groups.[12]

27. There is no indication that General Oveissi's death was caused by anything but the gunshot wounds he suffered at the hands of Defendants' agents, operating as Islamic Jihad.

28. Following General Oveissi's brutal murder, Plaintiffs immediately returned to the United States.

29. Shahryar, who was almost five years old at the time of his father's death, vividly remembers the day his father was killed and recalls his mother screaming and how frantic things were when she received the phone call that General Oveissi had been shot in the head.

30. Hossein, who was nearly ten years old at the time of his father's death, also recalls many details from the day his father was murdered. He remembers being taken to his uncle's apartment after school that day instead of his own home and was not allowed to watch television for nearly a week after the shooting in order to shield him from media coverage of the event. Hossein remembers his mother being in "shambles" and crying and that "there was an aura of fear everywhere" after the assassination.

31. The violent death of General Oveissi was shocking to Plaintiffs and other members of the extended Oveissi family, since they experienced the sudden and tragic loss of a close and important relative. The loss was amplified by the fact that General Oveissi's death had been a significant fear of the family's for several years, since General Oveissi was a primary target of the Iranian regime.

32. Since fleeing Iran, General Oveissi himself had remained active in the movement to retake Iran and re-install the Shah as the secular leader of the country.[13]

33. While in exile, General Oveissi attracted a number of former royalist army officers to his banner, received substantial financial backing from the Shah's family and ran an anti-clerical radio station based in Iraq, called the Free Voice of Iran.[14]

---

12. *Id*; *Emirates' Ambassador to France Assassinated*, THE WASHINGTON POST (Feb. 9, 1984); Iran Human Rights Documentation Center, *No Safe Haven: Iran's Global Assassination Campaign* (2008), *available at* https://iranhrdc.org/no-safe-haven-irans-global-assassination-campaign ("IHRDC Report").

13. *Oveissi I*, 498 F. Supp. at 274.

14. Iran Human Rights Documentation Center, *No Safe Haven: Iran's Global Assassination Campaign* (2008), *available at* https://iranhrdc.org/no-safe-haven-irans-global-assassination-campaign ("IHRDC Report").

34. General Oveissi was involved in organizing a counter revolution movement against the Revolutionary Government of Iran.

35. Iranian revolutionary authorities treated General Oveissi as a very real threat to their power. In a press interview recorded in his memoirs, Ayatollah Sadegh Khalkhali, a religious judge and Chairman of the Iranian Revolutionary Court, announced that a death sentence had been passed on General Gholam Ali Oveissi as well as others who held prominent positions in the last Iranian regime stating:

> The deposed Shah, Farah [the Queen], Farideh Diba [Farah's Mother], Gholam Reza Pahlavi, Ashraf [Shah's twin sister], Shapour Bakhtiar, General Azhari, Sharif Emami, General Oveisi…who in Iran's view are all criminals are condemned to death. Any Iranian who kills one of these people in foreign countries is considered an agent executing an order.[15]

36. However, despite General Oveissi's activism and the threats of the Iranian government, the Plaintiffs believed General Oveissi and the rest of the family in Paris to be protected from Iranian acts of terror. Further, the Rue de Passy where General Oveissi was attacked and killed is a busy and safe street in Paris. This sense of familiarity and security was shattered by General Oveissi's murder and thus created immense distress for the Plaintiffs, which jarred them from their normal life.

37. In addition to the suddenness of General Oveissi's death, the murder had a lingering impact on the General's family who were forced to relocate permanently to their home in Connecticut for their own safety after the attack.

38. The Oveissi family was severely traumatized by the violent death of General Oveissi and was fearful that the same terrorist group that killed General Oveissi would come after additional family members. This fear was exacerbated by the fact that General Oveissi's brother, Gholam Hossein Oveissi, was murdered in the same attack on the Rue de Passy in Paris and that other family members could have been hurt or killed also, had they been with the two men at the time of their assassination.

39. The death of General Oveissi created a difficult set of circumstances for his wife, Plaintiff Sharareh Oveissi. Sharareh was immediately forced to flee the family's home in Paris with her two young sons and travel back to the United States to escape potential

---

15. Iran Human Rights Documentation Center, *No Safe Haven: Iran's Global Assassination Campaign* (2008), *available at* https://iranhrdc.org/no-safe-haven-irans-global-assassination-campaign ("IHRDC Report"); Ayatollah Haj Shaykh Sadegh Khalkhali, *Khatirat-I Ayatollah Khalkhali, Avvalin Hakim-I Shar'-I Dadgahhayih Inqilab* [Memoirs of Ayatollah Khalkhali, the First Religious Magistrate of the Revolutionary Courts] at 75, Sᴀʏɪʜ Pᴜʙʟɪᴄᴀᴛɪᴏɴ (2004).

persecution from the same Iranian agents that murdered her husband. While she got her

family back to the safety of the United States, where they permanently settled, Sharareh

had to deal with the emotional fallout of her husband's death for both herself and her two

young sons. Sharareh was left to raise and support both boys on her own as a single

mother and the family encountered difficulties adjusting to their new life in the United

States without General Oveissi's emotional or financial support.

40. General Oveissi's murder had definite effects on his son, Plaintiff Hossein Oveissi.

Hossein, who was not yet ten at the time of his father's murder. Hossein was not prepared

for the death of his father and recalls the entire situation seeming surreal at the time.

After moving to the United States with his mother and brother, Hossein frequently

engaged in fights at school as an outlet for his anger as he was struggling with his

emotions as they related to his family and his father's death. Hossein reports feeling like

an outsider in his school community and having difficulty making friends due to the

community's knowledge about his family's past and fear due to his father's violent death.

Hossein struggled with emotional problems and academic difficulties throughout his

childhood and into high school. He had trouble studying, concentration issues, bouts of

panic attacks, and depression as a result of his father's assassination. While he played

organized sports in high school, which served as an outlet for his emotional problems, he

struggled with his father's absence at sporting events and had difficulty at times watching

other sons and fathers interacting. After graduating from high school, Hossein moved to

Boston to attend Boston University where he began having more adult manifestations of

the emotional consequences of his father's murder.

41. Certainly, Plaintiff Hossein Oveissi is still struggling today with the consequences of his

father's death. In college and throughout his youth, Hossein struggled with alcohol use as

a way to "escape his reality" and describes difficulties with maintaining serious romantic

relationships due to his fear of fatherhood and responsibility. Hossein has moved around

and changed jobs frequently in adulthood as a result of his unrest and emotional

difficulties. Overall, Hossein has had trouble maintaining a "normal" lifestyle because of

his unusual upbringing and the trauma of his father's death. It has taken him numerous

years to feel comfortable with himself and to be unafraid of something happening to his

family. He has no plans of ever starting a family of his own for fear that something will happen to him like what happened to his own father.

42. The unpreparedness for the loss of General Oveissi was also not without major consequences for Plaintiff Shahryar Oveissi. Upon his family's return to the United States, Shahryar, a very young child, was considered incredibly withdrawn, shy and scared by his teachers at Greenwich Country Day School in Greenwich, CT. Shahryar saw a child psychiatrist and was given extra educational counseling at school to deal with his academic difficulties. Shahryar was wrought with fear that his family was going to be killed and would occasionally suffer from nightmares and anxiety attacks due to the fact that the assassination of his father was so unexpected and violent. As a young boy, he would miss school often out of fear of being away from his mother as he worried something would happen to her. Shahryar also recalls having difficulty sleeping at night as a child due to a fear of someone breaking into his house and would often sleep with a knife or pellet gun near his bed. Further, Shahryar suffered from depression throughout his childhood due to the loss of his father and the absence of a father figure in his life.

43. Indeed, Plaintiff Shahryar Oveissi is still dealing with the effects of his father's murder to this day. He is consumed by anxiety and fear for his family's safety and is constantly worried about death and loss. As a father now himself, Shahryar is overly concerned with his children's health and safety. Moreover, Shahryar's career has been impacted by his anxiety and he is constantly stressed about the fear of losing his job and being unable to support his family, a concern he would not have if the family had remained in control of his father's Iranian assets. Shahryar also worries about he and his family's safety while traveling abroad. The family lives in constant fear that they will also be executed by Defendants' agents as retaliation for their escape from Iran. Shahryar Oveissi asserts that all his psychological problems stem from the traumatic loss of his father.

44. Directly after General Oveissi's death, out of concern for the high number of terrorist acts in Europe sponsored by the Iranian government, a judicial inquiry was held in Berlin, Germany.

45. These judicial inquiries were for the purpose of establishing the role and responsibility of the government of Iran in the planning and extrajudicial killings of individuals outside the territory of Iran.

46. The court in Berlin rendered a verdict on April 10, 1997 and provided a list of 264 victims of state sponsored terrorism by Iran.

47. General Gholam Ali Oveissi is listed as victim Number 7, killed in February of 1984 in Paris, France.

48. The government of Iran was given proper notice in accordance with the law of the Federal Republic of Germany and had the right to call their own witnesses and cross-examine adverse witnesses, but entered no defense. Thus, by its silence in the face of accusations, Iran admitted to its complicity in the extrajudicial killing of General Gholam Ali Oveissi.

49. The government of Iran confiscated General Oveissi's substantial property holdings within Iran, estimated in the millions of United States dollars, and has deprived General Oveissi's family of their rightful claims, use and enjoyment of these properties.

50. General Oveissi was a successful and industrious businessman, capable of substantial earnings and profits that would have gone into his estate. As a result of the terrorist extrajudicial killing of General Oveissi by the Iranian government, he lost his property, earnings, profits and monetary value that would have accrued to his estate and as a consequence, his heirs lost their rights to inherit this property.

51. General Oveissi had a very diverse portfolio of real estate holdings in Iran. General Oveissi owned multiple properties and while still residing in Iran granted land specifically to his son, Hossein Oveissi, and his wife, Sharareh Oveissi.

52. The Oveissi family declares that General Oveissi owned nine properties in Iran, but the Iranian government has seized these assets and due to security risks Plaintiffs have not been able to start any probate proceedings in Iran. The estimated total value of these properties that would have been distributed between the Plaintiffs are summarized in the chart below:

| Description of Property | Estimated Value (USD) |
|---|---|
| 800,000 square meters of land in the city of Gonbad | $88,000,000 |
| 100,000 square meters of land in the city of Nowshahr | $15,000,000 |
| 5,000 square meters of land in the city of Tehran | $1,500,000 |
| Twelve-bedroom home in the city of Tehran | $5,000,000 |
| 300,000 square meters of land in the city of Gorgan | $36,000,000 |
| 1,000,000 square meters of land in the city | $175,000,000 |

| | |
|---|---|
| of Babol | |
| 1,500,000 square meters of land in the city of Ghom | $225,000,000 |
| Rezabad farm near the city of Kashoun | $1,000,000 |
| Saidabad farm near the city of Kashoun | $1,000,000 |

53. In total, the Oveissi Family estimates the value of these combined properties, all of which were located in prime areas of populated cities to have been $547,500,000 USD as of 1979.

54. Moreover, some of the properties that General Oveissi owned in Iran produced an annual income. In particular, General Oveissi owned two farms that produced fruit, including apples, melons, pears, walnuts, cherries, prunes, and watermelons.

55. This produce from the two farms was sold annually at various markets throughout Iran. Based on the revenue from the final years before he lost the ability to oversee the production and sale of said produce, the Oveissi family estimates that the yearly earnings from the sale of produce from the farmland was between $4 million and $5 million USD.

56. In addition to the farms, General Oveissi also operated an irrigation enterprise based on water rights he owned in the Atrek River in Iran. In the years leading up to 1979, the annual earnings of this business were approximately $2 million USD.

57. The Oveissi family asserts that this annual income from General Oveissi's property, multiplied by the remainder of the life expectancy of General Oveissi had he not been assassinated (twenty-one years), would have amounted to approximately $136,500,000 USD.

58. The Plaintiffs are heirs of General Gholam Ali Oveissi and General Oveissi's estate and are claimants against the Iranian government.

59. As of the date of this Complaint, Plaintiffs' properties are held by Iran, and Plaintiffs are denied any benefit from these properties.

60. As a result of the extrajudicial killing of General Oveissi, the Oveissi family has experienced immense financial and emotional hardship and will continue to suffer severe emotional distress, mental anguish and loss of solatium for the rest of their lives.


**COUNT I—WRONGFUL DEATH CLAIM**

61. Plaintiffs repeat and re-allege each and every allegation written above with like effect as if alleged herein, and further allege below.

62. Iran was a state sponsor of terrorism as described in 28 U.S.C. § 1605A(a)(2)(A)(i).

63. General Gholam Ali Oveissi was the victim of state sponsored terrorism by virtue of his extrajudicial killing in Paris, France by agents of the Iranian government and MOIS.

64. The death of Gholam Ali Oveissi constitutes an extrajudicial killing as defined by 18 U.S.C. Section 2339A.

65. The Iranian agents were acting within the scope of their office and agency when they engaged in the extrajudicial killing.

66. As a direct and proximate result of the willful, wrongful, intentional, and reckless acts of MOIS and its agents, whose acts were funded and directed by the Islamic Republic of Iran, Plaintiff suffered, inter alia, death, physical pain and suffering, mental anguish, emotional pain and suffering, and/or economic losses resulting from Defendants' acts.

67. Pursuant to 28 U.S.C. § 1605A, Plaintiffs, who are nationals of the United States, may assert a cause of action against Defendants for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

68. Plaintiffs, the Oveissi family, have suffered damages as a proximate cause of the death of General Gholam Ali Oveissi in the form of sorrow, mental anguish and solace, loss of society, companionship, comfort, kindly offices and advice of the decedent.

69. In addition, Plaintiffs seek compensation for expected loss of income of the decedent and services, care and assistance.

70. Plaintiffs seek damages for this count in the amount of Six Hundred Million USD ($600,000,000.00).


## COUNT II
## LOSS OF SOLATIUM

71. Plaintiffs repeat and re-allege each and every allegation written above with like effect as if alleged herein, and further allege below.

72. As a direct and proximate consequence of the act of terrorism resulting in the death of General Gholam Ali Oveissi, Plaintiffs were deprived of the services, solace, society, companionship, comfort, kindly offices, advice, care and assistance of Gholam Ali

Oveissi and have suffered and will suffer severe mental anguish grief and injury to their feelings.

## COUNT III
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

73. Plaintiffs repeat and re-allege each and every allegation written above with like effect as if alleged herein, and further allege below.

74. The agents of IRAN and MOIS carried out the extrajudicial killing of General Gholam Ali Oveissi, with the intention of inflicting severe emotional distress upon his wife and children, as a means of achieving their political objectives which included, *inter alia*, control of Southwest Asia, expulsion of the United States from areas in the world populated by persons of Islamic faith and elimination through genocide of the Jewish people and the State of Israel.

75. The injuries suffered by the Plaintiffs as a consequence of these actions were not collateral to these terrorist acts but were the intended result of them.

## COUNT IV
## CONVERSION

76. Plaintiffs repeat and re-allege each and every allegation written above with like effect as if alleged herein, and further allege below.

77. General Gholam Ali Oveissi was a successful businessman and property owner with vast assets in the Islamic Republic of Iran, including real estate, farms, personal property and irrigation enterprises.

78. The Islamic Republic of Iran confiscated and converted his property, both real and personal, for its own uses, without compensation.

79. The value of the decedent's property, wrongfully converted, is at least $547,500,000 USD.

80. Plaintiffs have been deprived of their rightful claim to the decedent's property and the accretion thereto as their inheritance.

81. The Islamic Republic of Iran has been unjustly enriched by conversion of General Oveissi's real and personal property.

82. Plaintiffs have suffered damages in the loss of the value of the property, accretion to the value and consequential damages as the proximate cause of defendant's conversion.

83. Plaintiffs seek damages for this count in the amount of Five Hundred Forty-Seven Million and Five Hundred Thousand USD ($547,500,000.00) plus interests.


## COUNT V
## LOST PROFITS AND LOST EARNINGS

84. Plaintiffs repeat and re-allege each and every allegation written above with like effect as if alleged herein, and further allege below.

85. In addition to losing the value of the real and personal property described above, including capital assets, General Gholam Ali Oveissi's business enterprises were deprived of making profits on an annual basis.

86. The value of the earnings and the profits from the farm, the irrigation enterprise and other business ventures were lost as the proximate cause of the extrajudicial killing and the conversion of General Oveissi's real and personal property.

87. The value of earnings and profits lost is approximately $6,500,000 USD on an annual basis, multiplied by the remainder of his life expectancy for a sum total of $136,500,000 USD.

88. Plaintiffs have suffered damages as the proximate cause of the extrajudicial killing as measured in lost earnings and lost profits that would have been accretions to the estate of General Oveissi.

89. This extrajudicial killing denied General Oveissi's estate and the Plaintiffs, as heirs to the estate, from asserting claims to the estate.

90. Plaintiffs seek damages for this count in the amount of at least One Hundred Thirty-Six Million and Five Hundred Thousand USD ($136,500,000.00).


## COUNT VI
## WRONGFUL DEATH
## (UNDER TORTURE VICTIMS PROTECTION ACT OF 1991)

91. Plaintiffs repeat and re-allege each and every allegation written above with like effect as if alleged herein, and further allege below

92. Plaintiffs are legal claimants for a Wrongful Death Claim against the government of Iran.

93. General Gholam Ali Oveissi has been assassinated by Iran. The government of Iran conducted an act of extrajudicial killing in Paris, France by its agents.

94. The death of Gholam Ali Oveissi constitutes an extrajudicial killing as defined by 18 U.S.C. Section 2339A.

95. The Iranian agents were acting within the scope of their office and agency when they engaged in the extrajudicial killing.

96. Plaintiffs, the Oveissi family, have suffered damages as a proximate cause of the death of General Gholam Ali Oveissi in the form of sorrow, mental anguish and solace, loss of society, companionship, comfort, kindly offices and advice of the decedent.

97. In addition, Plaintiffs seek compensation for expected loss of income of the decedent and services, care and assistance.

98. Plaintiffs seek damages for this count in the amount of Six Hundred Million USD ($600,000,000.00).

**COUNT VII—PUNITIVE DAMAGES**

99. Plaintiffs repeat and re-allege each and every allegation written above with like effect as if alleged herein, and further allege below.

100.     Plaintiff repeats and re-alleges each and every allegation set forth above with like effect as if alleged herein. The actions of the Islamic Republic of Iran, who has been committing, sponsoring, and supporting acts of terror against international and domestic target, and was designated as a State Sponsor of Terror for decades.

101.     In addition, Iran's records of human rights abuse of its citizens and dual citizens are among the worst countries in the world. There are numerous cases similar to Mr. Oveissi, which Iran conducted terrorism act and assassinated individuals internationally.

102.     The acts of the Defendants, and each of them, carried out by their agents as described above, were malicious, willful, unlawful and in wanton disregard of life and the standards of law that govern the actions of civilized nations. The loss of life as above described was intended as a result by each Defendant.

103.     General Oveissi and each of his family members are each victims of the acts of terror committed by Iran with the material support of each of the Defendants. In

accordance with the provisions of 28 U.S.C §1605A(c) the Plaintiff are thereby entitled to a maximal award of punitive damages to the fullest extent of the law.

104. Iran, as a country with history of human rights abuses and sever violations of International law, caused pain to many who were promoting internationally acceptable norms and human rights. Many Iranian and foreigners, including Americans, lost life, liberty, health, and property due to continued act of terror and torture conducted by Iran.

105. This case is among few bringing light to domestic act of terror by Iran against human right activists and those fighting the brutal regime of Iran. The punitive penalty of such activities should be so high to prevent Iran from violating international human rights, torturing individuals, taking hostages, and extrajudicial killings.  Iran has a defenseless record of human right abuses. Regrettably, there was no penalty imposed to Iran for its violation, for similar cases in hand.

106. WHEREFORE, the Plaintiff prays that judgment be entered on this count, against the Islamic Republic of Iran, Seyed Ali Hosseini Khameni, and IRGC, jointly and severally, on behalf of Plaintiff, in the amount of Five Hundred Million USD ($500,000,000.00).

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against all Defendants and respectfully request the following relief:

107. General Gholam Ali Oveissi's family is entitled to compensatory damages for personal injury, extrajudicial killing (wrongful death), and intentional infliction of emotional distress suffered as a result of General Oveissi's death.

108. All Plaintiffs are entitled to solatium damages for General Oveissi's death (under 28 U.S.C. § 1605A(c)).

109. All Plaintiffs are entitled to special damages and other compensation for property loss suffered as a result of General Oveissi's extrajudicial killing.

110. All Plaintiffs are entitled to consequential damages for their lost earning potential and other long-term damages.

111. All Plaintiffs are otherwise entitled to general damages and all other applicable damages.

**112.**     Punitive damages should be assessed (under 28 U.S.C. § 1605A(c)).

**113.**     The Court should award Plaintiffs their full costs and attorneys' fees as incidental

damages and as otherwise appropriate.

**114.**     The Court should grant such further and other relief as this Court deems just and

proper.

Dated: September 23, 2019

Respectfully submitted,

_____/s/_____
Ali Herischi, Esq. (MD0024)
Herischi & Associates LLC
7201 Wisconsin Ave., Suite 450
Bethesda, Maryland 20814
Phone: 301-363-4540
Fax: 301-363-4538
*Attorney for Plaintiffs*