# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SHAHRYAR OVEISSI, *et al.*,

     *Plaintiffs*,

     v.

ISLAMIC REPUBLIC OF IRAN, *et al.*,

     *Defendants.*

Civil Action No. 19-2846 (RDM)

## <u>MEMORANDUM OPINION AND ORDER</u>

This action arises out of the assassination of General Gholam-Ali Oveissi[1] in Paris, France in 1984.  Plaintiff Sharareh Oveissi is General Oveissi's widow, and Plaintiffs Shahryar Oveissi and Hossein Oveissi are the couple's sons.  The defendants are the Islamic Republic of Iran ("Iran"), Iranian Supreme Leader Seyed Ali Husseini Khamenei, and the Iranian Ministry of Intelligence and Security ("MOIS").  Alleging that Defendants are responsible for the extrajudicial killing of General Oveissi, Plaintiffs bring suit pursuant to the state-sponsored terrorism exception to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A.

Because Defendants have not answered or otherwise appeared, the Clerk of Court entered a default on January 19, 2021.  *See* Dkt. 12.  One Plaintiff, Shahryar Oveissi (hereinafter "Shahryar"), now moves for entry of a default judgment against one Defendant, the Islamic Republic of Iran.  *See* Dkt. 18.  For the reasons explained below, the Court finds that Shahryar has established his right to relief under 28 U.S.C. § 1605A(c) and that he is entitled to non-

---

[1] In the record Oveissi is sometimes spelled "Oveisi," and "Gholam-Ali" is sometimes written as "Gholam Ali" without the hyphen.  The Court will use the Plaintiff's spelling but, when quoting other sources, will leave the spelling as it appears in the original source.

economic damages of $7,500,000 and punitive damages of $30,000,000, for a total award of $37,500,000. Shahryar has not, however, shown that he is entitled to recover for the value of property that Iran confiscated from General Oveissi's heirs in 2010, when his heirs failed to appear in Iranian judicial proceeding to contest the confiscation. The Court will, accordingly, **GRANT** in part and **DENY** in part Shahryar's motion for the entry of a default judgment against the Islamic Republic of Iran. Because Shahryar's claims against the other Defendants, and his mother's and brother's claims against all of the Defendants, remain pending, the Court will not enter final judgment at this time.

## I. INTRODUCTION

General Gholam-Ali Oveissi was a four-star general who served in the Iranian Imperial Army under the former Shah of Iran prior to the 1979 Iranian Revolution. Dkt. 18-1 at 2 (Shahryar Decl. ¶ 3). After the revolution, General Oveissi was forced into exile, along with his family. *Id.* at 2–3 (Shahryar Decl. ¶ 3); Dkt. 18-13 at 8. Leaving Iran, however, was not enough to protect General Oveissi. On February 7, 1984, General Oveissi "and his brother, Gholam Hossein Oveissi, were both shot in the head from close range on a Paris street," and both "died instantly." Dkt. 18-13 at 28. The Islamic Jihad claimed responsibility for General Oveissi's killing, and, according to press reports, "the Government of Iran . . . characterized the killings as a 'revolutionary execution.'" *Id.* at 29.

Plaintiffs allege that members of the Islamic Jihad carried out the murder of General Oveissi as "agents" for the Iranian MOIS and that they were "funded and controlled by defendant Iran through defendant MOIS." Dkt. 1 at 5 (Compl. ¶ 18). At the time of the murder, Shahryar Oveissi was almost five years old, *id.* at 7 (Compl. ¶ 29), leaving him "severely traumatized" and "fearful that the same terrorist group that killed" his father "would come after"

2

him and other members of his family, *id.* at 8 (Compl. ¶ 38). Along with his mother and brother, Shahryar brings this suit against Defendants pursuant to the state-sponsored terrorism exception to the FSIA and the cause of action set forth in that provision, 28 U.S.C. § 1605A(c), as well as several common law causes of action. Dkt. 1 at 12–16. None of the Defendants has answered, filed a motion under Federal Rule of Civil Procedure 12, or otherwise appeared. Accordingly, at Plaintiffs' request, the Clerk of the Court declared all Defendants in default on January 19, 2021. *See* Dkt. 12. Pending before the Court is Shahryar's Second Motion for Default Judgment, in which he requests that the Court enter a default judgment against the Islamic Republic of Iran pursuant to 28 U.S.C. § 1605A(c), finding Iran liable for the extrajudicial killing of his father and awarding him damages for "loss of solatium and pain and suffering," "economic damages," and "punitive damages." Dkt. 18 at 1.

Even in a garden variety case, the entry of a default judgment "is not automatic," *Mwani v. bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005), and requires the exercise of "sound discretion," *Boland v. Yoccabel Const. Co., Inc.*, 293 F.R.D. 13, 17 (D.D.C. 2013) (citing *Jackson v. Beech*, 636 F.2d 831, 836 (D.C. Cir. 1980)). Most notably, the Court must—at a minimum—satisfy itself that it has subject-matter jurisdiction over the claims and personal jurisdiction over the defendants. *See Jerez v. Republic of Cuba*, 775 F.3d 419, 422 (D.C. Cir. 2014) ("A default judgment rendered in excess of a court's jurisdiction is void."); *Mwani*, 417 F.3d at 6 (explaining that the Court must "satisfy itself that it has personal jurisdiction before entering judgment against an absent defendant"). In cases brought against a foreign state, however, the Court's discretion to enter a default judgment is even more narrowly circumscribed. By statute, no federal or state court may enter a default judgment against a foreign state or instrumentality "unless the claimant establishes his claim or right to relief by evidence satisfactory to the court."

28 U.S.C. § 1608(e).  This is the same standard that applies to default judgments against the United States under Federal Rule of Civil Procedure 55(d).  *See Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017) ("*Owens VI*"), vacated in part and remanded on other grounds *sub nom. Opati v. Republic of Sudan*, 590 U.S. 418 (2020); *Hill v. Republic of Iraq*, 328 F.3d 680, 683 (D.C. Cir. 2003).

In a case, such as this, alleging that a foreign state materially supported acts of terrorism, the district court must determine "how much and what kinds of evidence the plaintiff must provide."  *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1047 (D.C. Cir. 2014).  But the Court must do so in light of Congress's purpose in enacting § 1605A—that is, to "compensat[e] the victims of terrorism [so as to] punish foreign states who have committed or sponsored such acts and [to] deter them from doing so in the future," *id.* at 1048 (quoting *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 88–89 (D.C. Cir. 2002)) (first alteration in original)—and the difficulty in obtaining "firsthand evidence and eyewitness testimony . . . from an absent and likely hostile sovereign," *Owens VI*, 864 F.3d at 785.  This means that, to obtain a default judgment against Iran, Shahryar must (1) carry his burden of producing evidence sufficient to show that his claims fall within the state-sponsored terrorism exception to the FSIA, *see* 28 U.S.C. § 1605A(a); *Owens VI*, 864 F.3d at 784; (2) establish that Iran was served in accordance with the FSIA, *see* 28 U.S.C. § 1608(a); and (3) establish his right to relief under federal law, *see* 28 U.S.C. § 1605A(c), or state law, *see Owens VI*, 864 F.3d at 809 ("the pass-through approach remains viable"), by offering evidence "satisfactory to the court," 28 U.S.C. § 1608(e).

Shahryar endeavors to meet this burden using several types of evidence: (1) declarations from Shahryar, his mother, brother, cousin, and a family friend; (2) documents regarding the

family's political asylum in the United States; (3) evidence of Shahryar's emotional damages; (4) documents addressing the family's economic damages and property valuations; and (5) reports, news articles, and the like regarding Iran and its support for terrorism. *See generally* Dkt. 18.  Plaintiff has also submitted an expert report from Dr. Patrick L. Clawson. *See* Dkt. 18-25.

Dr. Clawson is the Director for Research at the Washington Institute for Near East Policy, a think tank focusing on contemporary issues in the Middle East. *Id.* at 1.  This Court has previously qualified Dr. Clawson as an expert on "(1) the government of Iran; (2) Iran's sponsorship of terrorism; and (3) the Iranian economy," *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 168 (D.D.C. 2010); *see also Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 13 n.3 (D.D.C. 2009) (describing Dr. Clawson as providing "reliable and credible testimony" on "the involvement of Iran [and groups supported by Iran] in sponsoring and organizing acts of terrorism carried out against citizens of the United States").  Here, Shahryar offers Dr. Clawson as "an expert on Iranian terrorism activities."  Dkt. 18 at 26.  The Court is, once again, persuaded that he is well qualified to testify as an expert.

The Court has reviewed Shahryar's evidentiary submission, along with evidence submitted in other cases brought against Iran pursuant to 28 U.S.C. § 1605A.  In doing so, the Court has applied the Federal Rules of Evidence with understanding that, first, it has "the authority—indeed,. . . the obligation—to 'adjust [evidentiary requirements] to . . . differing situations,'" *Han Kim*, 774 F.3d at 1048 (quoting *Bundy v. Jackson*, 641 F.2d 934, 951 (D.C. Cir. 1981)) (modifications in *Han Kim*), and, second, that the Court need not "step into the shoes of the defaulting party and pursue every possible evidentiary challenge," *Owens VI*, 864 F.3d at 785.  In lieu of holding an evidentiary hearing, the Court relies on Plaintiffs' declarations,

exhibits, and the expert report submitted in this case. *See Kim*, 774 F.3d at 1047 (explaining that "FSIA leaves it to the court to determine precisely how much and what kinds of evidence the plaintiff must provide, requiring only that it be 'satisfactory to the court.'" (quoting 28 U.S.C. § 1608(e))); *see also Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 75 (D.D.C. 2017) (noting that "[c]ourts may rely on uncontroverted factual allegations that are supported by affidavits" as evidence to support an entry of default judgment); *accord Hekmati v. Islamic Republic of Iran*, 278 F. Supp. 3d 145, 157 (D.D.C. 2017) (explaining that a court "may not unquestioningly accept a complaint's unsupported allegations as true," but  may accept "[u]ncontroverted factual allegations that are supported by admissible evidence"); *Salzman v. Islamic Republic of Iran*, 2019 WL 4673761, at *6 (D.D.C. Sept. 25, 2019) (relying on family members' declarations "detailing their mental anguish and emotional suffering"); *Hake v. Bank Markazi Jomhouri Islami Iran*, 2022 WL 4130837, at *13 (D.D.C. Sept. 12, 2022) (relying on exhibits of plaintiffs' birth certificates to demonstrate U.S. citizenship).

Although the expert report and declarations "recount potentially inadmissible facts," many of these facts are necessary "to establish the basis for their admissible opinions" and, thus, are properly before the Court. *Owens VI*, 864 F.3d at 790; *see Hamen v. Islamic Republic of Iran*, 401 F. Supp. 3d 85, 93 n.3 (D.D.C. 2019).  The Court has an obligation "to engage with the underlying facts in order to explain why" it finds the experts' opinions credible. *Owens VI*, 864 F.3d at 790.  And to the extent the Court relies on sources cited in the reports, the Court notes that the government reports that they cite generally fall within the public records exception to the hearsay rule, which provides that "a record or statement of a public office" is admissible if it contains "factual findings from a legally authorized investigation" and does not "indicate a lack of trustworthiness."  Fed. R. Evid. 803(8).

The Court now makes the following findings of fact and conclusions of law:

## II. FINDINGS OF FACT

Shahryar starts by asking the Court to take judicial notice of the following findings made in prior cases involving his father's assassination: (1) General Oveissi was assassinated in February 1984 in Paris; (2) Iran was responsible for funding and controlling the assassins through MOIS; (3) the assassination was an act of extrajudicial killing by Iran within the meaning of the Torture Victim Protection Act of 1991 ("TVPA"), 28 U.S.C. § 1350 note, and the FSIA; (4) Iran's immunity is waived as to immediate relative plaintiffs who were U.S. citizens at the time of the killing; and (5) Iran may bear liability to the direct relatives of General Oveissi for proven economic, non-economic, and punitive damages that were caused by Iran's act of judicial killing. Dkt. 18 at 9–10. For support, Plaintiff relies on Judge Lamberth's opinion in *Oveissi v. Islamic Republic of Iran*, 498 F. Supp. 2d 268, 271 (D.D.C. 2007) ("*Oveissi I*"), *rev'd*, 573 F.3d 835 (D.C. Cir. 2009), which addressed claims brought by General Oveissi's grandson, Amir Reza Oveissi.[2]

Although prior decisions in this district "have . . . frequently taken judicial notice of earlier, related proceedings," *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 171 (D.D.C. 2010), that does not mean that the Court may simply accept the facts found in the earlier opinion, which would amount to a prohibited exercise of collateral estoppel, *see Weinstein v. Islamic Republic of Iran*, 175 F. Supp. 2d 13, 20 (D.D.C. 2001) ("[F]indings of fact made during the course of this type of one-sided [FSIA] hearing should not be given a preclusive effect."). The Court must, instead, make its own determinations with respect to the relevant facts in this

---

[2] Although the Court of Appeals reversed the District Court, it did so on choice-of-law grounds, not because of any disagreement on the facts. *See Oveissi v. Islamic Republic of Iran*, 573 F.3d 835, 837 (D.C. Cir. 2009) ("*Oveissi II*").

case.  Based on the evidence, the Court finds as follows: (1) General Oveissi was assassinated;

and (2) Iran, through its funding and control of the Islamic Jihad and MOIS, was responsible for

that assassination.  The Court will discuss the factual foundations for these two conclusions in

II.A and will proceed to discuss the factual background of Shahryar's injuries and the procedural

posture of the case in the subsequent sections of Part II.

**A.    General Oveissi and His Assassination**

Gholam-Ali Oveissi was a four-star general in the Iranian Imperial Army under the

former Shah of Iran.  Dkt. 18-1 at 2 (Shahryar Decl. ¶ 3); Dkt. 18-11 at 3 (Unclassified

Department of Defense Intelligence Information Report); *Oveissi v. Islamic Republic of Iran*,

573 F.3d 835, 837 (D.C. Cir. 2009).  In 1979, "revolutionaries deposed the Shah and established

an Islamic Republic."  *Oveissi*, 573 F.3d at 838; Dkt. 18-25 at 8.  "[A]t the height of the uprising

against the Shah," General Oveissi, his wife Sharareh, and their son Hossein fled to the United

States, where they "were granted political asylum and U.S. travel documents."  Dkt. 18-6 at 2–3

(Sharareh Decl. ¶ 3); *see also* Dkt. 18-4 (Oveissi FOIA records); Dkt. 18-5 (Oveissi Family

Asylum Approval).  Sharareh was pregnant with their second son, Shahryar, at the time.  Dkt.

18-6 at 2–3 (Sharareh Decl. ¶ 3).  Shahryar was born in New Jersey in June 1979.  *Id.* at 4

(Sharareh Decl. ¶ 6).  General Oveissi's "base of operations was in Paris" during this period, and

the "family traveled between the two countries frequently for several years."  Dkt. 18-1 at 2–3

(Shahryar Decl. ¶ 3); *see also* Dkt. 18-12 at 2 ("Gholam Ali Oveissi, the most important ex-

general in the exile movement, is understood to have returned to Paris today," September 28,

1980.).  Throughout this time, the family maintained a residence in Connecticut.  Dkt. 18-3 at 4

(Hossein Decl. ¶¶ 6, 8).

In February 1984, General Oveissi and his brother were assassinated on a busy shopping

street in Paris, France.  *See* Dkt. 18-6 at 4 (Sharareh Decl. ¶ 7); Dkt. 18-22 at 3; *Oveissi*, 673

F.3d at 838.  "Members of the terrorist group Hezbollah,[3] operating under the name Islamic Jihad, 'immediately claimed responsibility.'"  *Oveissi II*, 573 F.3d at 838 (quoting *Oveissi I*, 498 F. Supp. 2d at 274); *see* Dkt. 18-6 at 4 (Sharareh Decl. ¶ 7); Dkt. 18-13 at 29; Dkt. 18-25 at 15. Iran funds and works closely with Hezbollah, which used the name "Islamic Jihad" at times to conceal its role.  Dkt. 18-25 at 15; *see also* Dkt. 18-13 at 18–19 ("On October 25, 2007, the United States government designated the Quds Force and the Revolutionary Guards as supporters of terrorism for 'providing material support to the Taliban, Lebanese Hezbollah, Hamas, Palestinian Islamic Jihad . . . .'"); *id.* at 12 ("[T]he Iranian government has made extensive use of trusted surrogates, most notably the Lebanon-based terrorist group Hezbollah"); *id.* at 19–20 (noting that "[t]he Islamic Republic of Iran has enjoyed a close relationship with Lebanese Hezbollah since its inception" and that Hezbollah has pledged loyalty to Iran's clerical leadership); Dkt. 18-25 at 15 (describing Iran's relationship with Islamic Jihad); Dkt. 18-14 at 9 ("MOIS conducts liaison with other foreign intelligence agencies as well as with organizations such as Lebanese Hezbollah that protect and promote the Islamic Republic's foreign agenda."); *id.* at 34 ("Lebanese Hezbollah and the Quds Force are also organizationally linked to MOIS . . . . Support for Hezbollah has been one of the main objectives of Iran's foreign policy."); *cf. Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 51 (D.D.C. 2012) ("*Oveissi V*") ("[T]he evidence establishes that defendant Iran founded Hezbollah for the purpose of undertaking attacks such as the 1984 assassination and funneled money to the terrorist organization through defendant MOIS, and also demonstrates that both defendants played necessary planning, logistical and support roles leading up the horrific attack.").

---

[3] In the record Hezbollah is sometimes spelled "Hizbullah," *see* Dkt. 18-25.  The Court will use the spelling "Hezbollah," but, when quoting other sources, will leave the spelling as it appears in the original source.

Although immaterial for present purposes, there is some evidence that Iran's role extended beyond funding the organization that committed the assassination. Plaintiff contends that Iran, acting through MOIS, assassinated General Oveissi. *See* Dkt. 18 at 3–4 ("Islamic Jihad, a relatively-unknown group at the time, immediately claimed responsibility for the assassination but Defendant the Islamic Republic of Iran later admitted that its agents, employed by MOIS, carried out this attack."). And Dr. Clawson's expert report offers some support for that contention. He attests that although the Oveissi brothers' assassinations were "claimed by Islamic Jihad, it is by no means clear that this organization was in fact behind the assassinations." Dkt. 18-25 at 15. For support, he points to a declassified CIA report from July 31, 1985, which concluded that "Iranian intelligence agents probably conducted" the assassination. *Id.* at 16; Dkt. 18-26 at 1. Dr. Clawson also cites a press interview of Ayatollah Sadegh Klalkhali, an Iranian religious judge who served as Chairman of the Revolutionary Court, in which Ayatollah Klalkhali asserted that Iran considered General Oveissi a "criminal[]" who was "condemned to death" and that "[a]ny Iranian who kill[ed] [him] in [a] foreign countr[y]" would be "considered an agent executing a court order." Dkt. 18-25 at 16; *see also* Dkt. 18-13 at 29. In Dr. Clawson's opinion, Iran "had the resources to have its intelligence agents directly carry out a professional assassination without being detected." Dkt. 18-25 at 16. MOIS "was a world-class intelligence agency known for its ruthlessness." *Id.* It had stepped into the shoes of Iran's pre-revolution intelligence organization, which "was renowned for its craftwork in the intelligence business" and "was the most respected intelligence agency in the Middle East outside of the Israeli agencies." *Id.* at 16–17. Finally, Dr. Clawson concludes "to a reasonable degree of certainty" that "General Oveissi was killed by persons acting at the direction and under the orders of Iranian government officials." *Id.* at 18.

Plaintiff offers additional evidence corroborating Dr. Clawson's conclusion that Iran was likely responsible.  To start, he proffers a report from the Iran Human Rights Documentation Center.  *See* Dkt. 18-13.  According to that report, "[t]he day after Oveisi's murder, the Government of Iran reportedly characterized the killings as a 'revolutionary execution.'"  *Id.* at 29.  And "[s]pokespersons for several Iranian exile organizations opposing the Islamic Revolution publicly accused the Iranian government of ordering the killings in an attempt to intimidate opposition groups."  *Id.*  A report prepared by the Library of Congress's Federal Research Division, moreover, lists the assassination of General Oveissi as among the assassinations in which "MOIS has been involved."  Dkt. 18-14 at 53.

Based on this evidence, the Court finds that Iran was responsible for the extrajudicial killing of General Oveissi and his brother—either directly through the actions of MOIS or indirectly by supporting the Islamic Jihad.

## B.    Plaintiff's Injuries

After the Iranian-sponsored assassinations, Sharareh Oveissi "fled Paris with [her] two small children, widowed at the age of 31, and returned to [their] house in Greenwich, CT a few months later."  Dkt. 18-6 at 4 (Sharareh Decl. ¶ 7).  Although this lawsuit was brought by Sharareh and her two sons, Shahryar and Hossein, only Shahryar has moved the Court for default judgment.  Dkt. 18 at 1.  The Court, accordingly, considers only his injuries for present purposes.

### 1.    *Evidence concerning Shahryar's emotional damages*

Shahryar was only four years old when his father was assassinated, Dkt. 18-1 at 2–4 (Shahryar Decl. ¶¶ 2, 5), but his father's murder has left lifelong scars.  Upon returning to the United States, Shahryar "was incredibly withdrawn, shy[,] and scared."  *Id.* at 4 (Shahryar Decl. ¶ 6).  He had years of counseling, dealt with "frequent anxiety attacks," and "developed OCD and nervous ticks."  *Id.* at 4–5 (Shahryar Decl. ¶¶ 6–7).  He "would often keep a kitchen knife by

[his] bed at night, or as [he] got older a pellet rifle by [his] bed, just in case someone broke into [his] house." *Id.* at 5 (Shahryar Decl. ¶ 8).  Shahryar's challenges were "compounded by [his] mother and brother's pain." *Id.* at 6 (Shahryar Decl. ¶ 10).  He recounted, for example, that his "mother could barely look at a photo of [his] father without crying." *Id.* at 7 (Shahryar Decl. ¶ 11).  He also explained the financial difficulties his family experienced, explaining that, "[w]ithout [his] father, [the family] had very little income" and that he "began working as soon as possible to be able to support [his] family." *Id.*  Shahryar's childhood mental health challenges are confirmed by his mother, Dkt. 18-6 at 6 (Sharareh Decl. ¶ 12), Eckley Brinton Coxe, a close childhood friend of Shahryar's, *see* Dkt. 18-8 at 3–5 (Coxe Decl. ¶ 4, 6, 8), and an administrator from Shahryar's school, who describes Shahryar as "by far our most challenging student," Dkt. 18-9 at 2.

The effects of Shahryar's childhood trauma have continued into adulthood.  He reports that, even today, he "cannot handle loss and the fear of loss." Dkt. 18-1 at 8 (Shahryar Decl. ¶ 13).  This "fear of loss and retaliation," moreover, "has also caused [him] great harm in [his] career" and other pursuits. *Id.* at 8 (Shahryar Decl. ¶ 14).  His fear was particularly acute when he "worked in the investment advisory industry with a specific focus on the Middle East" and needed to spend significant periods of time in the United Arab Emirates, "which has a significant population of Iranians living in Dubai, as well as visitors from Iran." *Id.* at 9 (Shahryar Decl. ¶ 15).  Matters were made worse when, after appearing on a television news program to discuss the Iranian elections in 2009, Shahryar received an anonymous phone call "warning [him] to be careful with the interviews [he] g[a]ve and what [he] sa[id] about Iran;" since then, he has not given any interviews. *Id.* at 9–10 (Shahryar Decl. ¶ 16).  It was not until recently, after Shahryar "made a career change that keeps [him] in the United States," that he felt safe enough to bring

this lawsuit.  *Id.* at 11 (Shahryar Decl. ¶ 18); *see also* Dkt. 18-3 at 10 (Hossein Decl. ¶ 18)

("About a decade ago, a relative of ours brought a lawsuit against the Iranian government

regarding our father's assassination.  At the time, my brother Shahryar was traveling frequently

to the Middle East for work . . . .  We knew that participating in any sort of lawsuit against Iran

at that time would be damaging and likely extremely dangerous, especially for Shahryar.").

       Based on these injuries, Shahryar seeks $10,000,000 in non-economic damages.  Dkt. 18

at 27.

       2.    *Evidence concerning Shahryar's economic damages*

       Shahryar also seeks economic damages to compensate him for his loss of a share of

"properties belonging to General Oveissi [that] were confiscated after his assassination," which

Shahryar was allegedly entitled to inherit after his father's death.  Dkt. 19 at 2.  In support of that

claim, Plaintiff relies principally on the Declaration of Reza Abdollahi.  *Id.* at 4–5; *see* Dkt. 19-4

(Abdollahi Decl.).  Mr. Abdollahi is an attorney in Iran who "examined the legal process of

confiscating the property of Commander Gholam Ali Oveissi."  Dkt. 19-4 at 2 (Abdollahi Decl.

¶ 1).  As Mr. Abdollahi explains in his declaration, about five years before General Oveissi was

assassinated, some (but not all) of General Oveissi's properties in Iran were confiscated pursuant

to a decree issued by Ayatollah Moqtadaei, the head of the Iranian judiciary at the time.  *Id.*

(Abdollahi Decl. ¶¶ 2–3).  Because those properties were confiscated before General Oveissi's

death, they are not at issue for present purposes; Shahryar does not argue that he ever had an

interest in the properties or that he lost his interest in those properties due to his father's murder.

       But not all of General Oveissi's properties had been confiscated at the time of his

assassination in 1984.  Those properties fall into two groups.  The first group includes properties

that General Oveissi inherited from his father, Gholam Reza, who was regarded as righteous by

the Islamic authorities.  *Id.* (Abdollahi Decl. ¶ 6).  The second group includes "a few parcels" of

property that General Oveissi "acquired during his tenure in the Pahlavi government," which were not included in Ayatollah Moqtadaei's decree. *Id.* (Abdollahi Decl. ¶ 7). Notably, Mr. Abdollahi attests that, as a matter of Iranian law, "it is not possible to confiscate the property of a person after his death," and the property would ordinarily transfer to the decedent's "heirs according to the Iranian laws of inheritance." *Id.* (Abdollahi Decl. ¶¶ 5–6).

"[U]ntil 2010, the issue of [General Oveissi's] not yet confiscated properties was still pending in the [Iranian] courts." *Id.* at 3 (Abdollahi Decl. ¶ 8). "[T]he [Iranian] [c]ourt held a hearing without [General Oveissi's] presence or that of his heirs, and the verdict was issued in absentia." *Id.* (Abdollahi Decl. ¶ 9). "As a result of this ruling," Mr. Abdollahi discovered, "those properties currently are under the ownership of Iran and its agencies, and they are using the profits from the possession of said property." *Id.* (Abdollahi Decl. ¶ 10). In his "legal opinion," Mr. Abdollahi explains that "this ruling was issued illegally; the proceedings took advantage of the fact that General Oveissi's family would never travel to Iran to appear in court, and in absence of any challenge, the court ruled to confiscate the properties subject to the complaint in absentia." *Id.* (Abdollahi Decl. ¶ 11).

In 2011, one of General Oveissi's grandchildren sued Iran in this Court, seeking (among other things) damages for his lost inheritance of property that Iran confiscated from General Oveissi, and Judge Lamberth rejected that request for relief on the ground that "the extrajudicial killing of General Oveissi was [not] the 'reason' for his [grandchild's] alleged property loss." *Oveissi V*, 879 F. Supp. 2d at 58. Mr. Abdollahi explains, however, that the properties at issue here—that is, those "listed in the [Iranian] court order of 2010"—"are different from the properties" which were at issue there—that is, the properties "subject to the confiscation order of 1979." Dkt. 19-4 at 3 (Abdollahi Decl. ¶ 11). Finally, Mr. Abdollahi opines that "Shahryar

Oveissi's share of the property" that was subject to the 2010 decree "is equal to 0.195 of the total value of the property." *Id.* (Abdollahi Decl. ¶ 13).

Shahryar maintains that he is entitled to $53,795,010 in economic damages resulting from this loss, which, he says, reflects the 2010 value of the portion of the confiscated property that he would have inherited under Iranian law, but for the 2010 confiscation. For support, he provides a Certified Land Appraisal for the seized properties which concludes that the combined value of the properties in 2010 would have been $237,768,000.[4] Dkt. 19-6 at 13. Shahryar also proffers a declaration from Mehrangiz Kar, an Iranian lawyer who Shahryar holds out as an expert in Iranian civil law and procedure. *See* Dkt. 19-5. Mr. Kar confirms that, under Iranian probate law, Shahryar's share of his father's estate would be 19.5%. *Id.* at 12 (Kar Decl. ¶ 37). In addition, Shahryar's mother, Sharareh, executed an assignment of 25% of her inheritance share to Shahryar. *Id.* at 13 (Kar Decl. ¶ 40). According to Kar, such an assignment is "allowed under Iranian probate law," and an assignment agreement of this type is "an enforceable legal instrument under Iranian law." *Id.* (Kar Decl. ¶ 41). Under Iranian probate law, Sharareh would be entitled to 12.5% of her husband's estate. *Id.* (Kar. Decl. ¶ 42). Shahryar's 25% share in that

---

[4] In Shahryar's first motion for default judgment, he initially asserted that the total value of these twenty-seven properties was $333,506,623.68. *See* Dkt. 14-27 at 2 ("General Oveissi Valuation of Confiscated [P]roperties in 2010 [a]s of September 7, 2021"). And he requested a total economic damages award of $75,455,973.61. Dkt. 14 at 33. The Court ordered supplemental briefing and any further evidence "on the question whether the assassination of General Oveissi was the cause of their alleged economic losses." Min. Order (Apr. 11, 2022). Shahryar accordingly submitted additional materials in support of his economic losses, including a declaration from an Iranian law expert, Mehrangiz Kar, who opined that "the assassination of General Oveissi was the proximate cause of the economic harm to Plaintiff, and the loss of inheritance from the estate of General Oveissi was the legal and natural consequence of the wrongful act of extrajudicial killing conducted by Iranian agents." Dkt. 17-6 at 14 (Kar Decl. ¶ 45). He also submitted a certified appraisal of the seized property as of the date of the taking, and reduced his economic damages request to $53,795,010 in accordance with the valuation in that appraisal. Dkt. 17 at 22; *see* Dkt. 17-7 (Certified Land Appraisal Report). The current motion relies on those updated figures.

portion due to the assignment would thus come to represent a 3.125% share of the total estate.

*Id.* In total, Kar calculated that Shahryar would be entitled to 22.625% of the estate. *Id.* (Kar.

Decl. ¶ 43). Using the value from the land appraisal, Shahryar thus claims the value of his share

of the confiscated properties would have been $53,795,010.

## C.    Procedural History

On September 23, 2019, Sharareh, Shahryar, and Hossein Oveissi filed the pending

action against Iran, Seyed Ali Hosseini Khamenei, and MOIS. *See* Dkt. 1 (Compl.). They

brought seven claims: wrongful death, *id.* at 12–13 (Compl. ¶¶ 61–70); loss of solatium, *id.* at

13–14 (Compl. ¶¶ 71–72); intentional infliction of emotional distress, *id.* at 14 (Compl. ¶¶ 73–

75); conversion, *id.* at 14–15 (Compl. ¶¶ 76–83); lost profits and lost earnings, *id.* at 15 (Compl.

¶¶ 84–90); wrongful death under the TVPA, *id.* at 15–16 (Compl. ¶¶ 91–98); and punitive

damages, *id.* at 16–17 (Compl. ¶¶ 99–106).

Plaintiffs requested an entry of default, Dkt. 11, which the Clerk entered on January 19,

2021, Dkt. 12. Then, on September 10, 2021, Plaintiff Shahryar Oveissi alone filed a motion for

default judgment. *See* Dkt. 14. In that motion, Shahryar requested a total of $385,455,873.61 in

damages: $10,000,000 in non-economic damages; $75,455,873.61 in economic damages; and

$300,000,000 in punitive damages. Dkt. 14-1 at 37. On April 11, 2022, the Court ordered

"supplemental briefing and evidence on the question whether General Oveissi's assassination

was the but-for cause and the proximate cause of Plaintiffs' property losses," Min. Order (Apr.

11, 2022). Plaintiff filed said briefing in July 2022. *See* Dkt. 17. The Court then held a hearing

on Shahryar's first motion on August 8, 2023, during which it explained that Plaintiff had failed

to provide the Court with "competent evidence . . . with respect to the question of whether the

Islamic Republic of Iran murdered General Oveissi." Aug. 8, 2023 Hrg. Tr. (Rough at 3). The

Court, accordingly, denied Shahryar's motion without prejudice. *See* Min. Entry (Aug. 8, 2023).

Shahryar filed a second motion for default judgment a year later, on August 5, 2024. *See* Dkt. 18. He also filed a supplemental memorandum in support of economic damages. *See* Dkt. 19. Plaintiff Shahryar Oveissi's second motion for default judgment is now ripe for consideration.

### III. CONCLUSIONS OF LAW

Under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1604, a foreign state, including its instrumentalities, is immune from suit in state or federal court unless the plaintiff's claim falls within an express statutory exemption. *See Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1126 (D.C. Cir. 2004). In this case, the only relevant exception is found in the "state-sponsored terrorism exception," 28 U.S.C. § 1605A, which both confers subject-matter jurisdiction to hear certain terrorism-related claims under state or federal law and recognizes a federal cause of action against those foreign states subject to the exception, *see Owens VI*, 864 F.3d at 764–65. The FSIA also addresses personal jurisdiction and specifies precise procedures that a plaintiff must follow—at times with the assistance of the Clerk of the Court and the U.S. Department of State—to effect service on a foreign state. 28 U.S.C. § 1608.

For various reasons, the Court must satisfy itself that an FSIA plaintiff has cleared each of these hurdles, even if the defendant fails to appear. First, because the FSIA deprives courts of subject-matter jurisdiction in the absence of a relevant exception, a failure to appear does not waive the defense, and the courts are "obligated to consider *sua sponte*" whether they have jurisdiction to hear the case and to order any relief. *Gonzalez v. Thaler*, 565 U.S. 134, 141 (2012); *see also Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 493 n.20 (1983) (even where a defendant foreign state does not appear, the Court "still must determine that immunity is unavailable"). Second, with respect to the substance of the plaintiff's federal or state law claims, the FSIA precludes courts from entering a default judgment against a foreign state unless

17

satisfied that the plaintiff has established her right to relief.  28 U.S.C. § 1608(e); *see also Owens VI*, 864 F.3d at 784–86.  Third, because "the entry of a default judgment is not automatic," courts must "satisfy [themselves] that [they have] personal jurisdiction before entering judgment against an absent defendant."  *Mwani*, 417 F.3d at 6.

Each of these inquiries implicates a slightly different standard of proof.  To establish subject-matter jurisdiction, an FSIA "plaintiff bears [the] initial burden of production to show an exception to immunity, such as § 1605A, applies," but, if the plaintiff does so, and the defendant does not appear, "jurisdiction attaches."  *Owens VI*, 864 F.3d at 784.  Having cleared this initial hurdle, however, "the plaintiff must still prove [her] case on the merits."  *Id.*  To do so, the plaintiff must "establish[ ] [her] claim or right to relief," *id.* at 785 (first alteration in original) (quoting 28 U.S.C. § 1608(e)), which does not "'relieve[ ] the sovereign from the duty to defend'" but, nonetheless, requires that the plaintiff offer admissible evidence sufficient to substantiate the essential elements of her claim,  *id.* at 785–86 (quoting *Com. Bank of Kuwait v. Rafidain Bank*, 15 F.3d 238, 242 (2d Cir. 1994)).  Finally, to establish personal jurisdiction over a defaulting defendant, the plaintiff must make "a prima facie showing of [personal] jurisdiction."  *Mwani*, 417 F.3d at 6.

A.     **Subject-Matter Jurisdiction Under the FSIA**

"[T]he [federal] district courts . . . have original jurisdiction" over "any nonjury civil action against a foreign state" asserting any claim for relief in personam with respect to which the foreign state is not entitled to immunity under the FSIA.  28 U.S.C. § 1330(a).  The Court, accordingly, has subject-matter jurisdiction over the present "nonjury civil action" against Iran if, and only if, the conditions for the waiver of immunity found in 28 U.S.C. § 1605A are satisfied. As explained below, Plaintiffs have carried their burden of establishing the Court's subject-matter jurisdiction.

Under the state-sponsored terrorism exception, 28 U.S.C. § 1605A(a)(1), "[a] foreign state shall not be immune from the jurisdiction of the courts of the United States or of the States in any case" in which

> [1] money damages are sought against a foreign state [2] for personal injury or death [3] that was caused by [4] an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is [5] engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

28 U.S.C. § 1605A(a)(1). There are two other requirements that must be satisfied. First, the claimant or victim must be a U.S. national, a member of the U.S. armed forces, or a U.S. government employee or contractor at the time the act of terrorism occurred. *Id.* § 1605A(a)(2)(A)(ii). Second, the foreign state must be designated as a state sponsor of terrorism both at the time the act occurred (or was so designated as a result of the act) and at the time the lawsuit was filed (or was so designated within the six-month period preceding the filing of the suit).[5] *Id.* § 1605A(a)(2)(A)(i)(I).

Most of these requirements are easily met here. First, Plaintiff seeks only monetary relief. Dkt. 1 at 17–18 (Compl. ¶¶ 107–14). Second, at the time that the relevant acts occurred, Plaintiff Shahryar was a U.S. national. *See* Dkt. 1 at 2 (Compl. ¶ 7) ("Shahryar was born in Livingston, New Jersey on June 18, 1979. Shahryar Oveissi is and was a United States citizen at all times material to this matter and is a domiciliary and resident of Connecticut"); Dkt. 18-1 at 2 (Shahryar Decl. ¶¶ 1–2); Dkt. 18-2 at 3 (Shahryar's Passport). Third, Iran was designated as a

---

[5] Section 1605A(a)(2) also requires that the foreign state received "a reasonable opportunity to arbitrate the claim," but only if the act of terrorism "occurred in the foreign state against which the claim has been brought." 28 U.S.C. § 1605A(a)(2)(A)(iii). That requirement is inapplicable to the facts of this case because the assassination occurred in France, not Iran. *Cf. Oveissi V*, 879 F. Supp. 2d at 52. In any event, Plaintiff's counsel did send an offer to arbitrate to Iran. *See* Dkt. 18-21.

state sponsor of terrorism on January 19, 1984, *see* 49 Fed. Reg. 2836-02 (Jan. 23, 1983)

(statement of Secretary of State George P. Shultz), and has remained designated as a state

sponsor of terrorism to this day, *see* U.S. Dep't of State, State Sponsors of Terrorism,

https://perma.cc/4AM7-AT36.  This longstanding designation of Iran as a state sponsor of

terrorism is sufficient to satisfy the designation requirement.  *See* 28 U.S.C.

§ 1605A(a)(2)(A)(i)(I).

As a result, the only substantial jurisdictional question left for the Court is whether

Plaintiff's claims are claims for "personal injury or death that was caused by . . . act[s] of torture,

extrajudicial killing, . . . or the provision of material support or resources for such an act" by an

"official, employee, or agent of" Iran.  28 U.S.C. § 1605A(a)(1).[6]  For the reasons explained

below, the Court concludes as follows: (1) Shahryar's claim for noneconomic damages resulting

from his father's murder seeks to recover for "a personal injury or death" within the meaning of

28 U.S.C. § 1605A(a)(1); (2) General Oveissi's murder was an "extrajudicial killing" within the

meaning of the Torture Victims Protection Act of 1991 ("TVPA"); (3) Iran was responsible for

General Oveissi's murder; and (4) Iran caused Shahryar's emotional distress injuries.

1.    *Personal injury or death caused by General Oveissi's assassination*

The FSIA effects a waiver of sovereign immunity for claims seeking to recover for

"personal injury or death that was caused by" certain terrorist acts or "the provision of material

support" for such acts.  28 U.S.C. § 1605A(a)(1).  Here, General Oveissi suffered a personal

injury—he was murdered on the streets of Paris in 1984.  Moreover, because the statute

---

[6] Although the FSIA's terrorism exception has a statute of limitations, 28 U.S.C. § 1605A(b), the D.C. Circuit has held that district courts "lack[] authority to *sua sponte* raise a forfeited statute of limitations defense in an FSIA terrorism exception case, at least where the defendant sovereign fails to appear."  *Malouf v. Islamic Republic of Iran*, 923 F.3d 1095, 1101 (D.C. Cir. 2019).  So, the Court need not (and may not) consider the exception's statute of limitations.

encompasses claims by a decedent's close family members for the distress caused by their relative's injuries, including solatium claims, *see* 28 U.S.C. § 1605A(c); *see also Salzman v. Islamic Republic of Iran*, No. 17-1745, 2019 WL 4673761, at *12 (D.D.C. Sept. 25, 2019), Shahryar's claim also satisfies the personal injury requirement of § 1605A(a)(1).  A family member's claim for solatium damages resulting from a terrorist attack may be treated for FSIA purposes as a variety of a claim for an intentional infliction of emotional distress, *see Oveissi V*, 879 F. Supp. 2d at 54–55, and, as such, constitutes a claim for personal injury, *id.* at 55.

The Court will separately address Plaintiff's property loss claim below.  For present purposes, it is sufficient to conclude that Shahryar's solatium claim is sufficient to satisfy the second prong of the statutory test for waiving sovereign immunity.

### 2. *Extrajudicial Killing*

To fall within the FSIA's waiver of sovereign immunity, Plaintiffs' "personal injur[ies] or death[s]" must also have been "caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act."  28 U.S.C. § 1605A(a)(1).  The FSIA looks to the TVPA for a definition of "extrajudicial killing."  28 U.S.C. § 1605A(h)(7).  Under the TVPA, "extrajudicial killing" means:

> a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples.  Such term, however, does not include any such killing that, under international law, is lawfully carried out under the authority of a foreign nation.

TVPA, Pub. L. No. 102-256, § 3(a), 106 Stat. 73.  As the D.C. Circuit has explained, this definition "contains three elements: (1) a killing; (2) that is deliberated; and (3) is not authorized by a previous judgment pronounced by a regularly constituted court."  *Owens VI*, 864 F.3d at 770.  Here, each of these conditions is satisfied:

a.      The February 1984 assassination constitutes a "killing."  General Oveissi and his brother were shot and killed on the streets of Paris.  Dkt. 18-6 at 4 (Sharareh Decl. ¶ 7); Dkt. 18-22 at 3; *Oveissi*, 573 F.3d at 838.

b.      The attack that caused General Oveissi's injuries was also "deliberated."  "A 'deliberated' killing is simply one undertaken with careful consideration, not on a sudden impulse." *Owens v. Republic of Sudan*, 174 F. Supp. 3d 242, 263 (D.D.C. 2016) ("*Owens V*") (subsequent history omitted) (citing Webster's Third New International Dictionary 596 (1993); 4 The Oxford English Dictionary 414 (2d ed. 1989); Black's Law Dictionary 492 (9th ed. 2009)).

Here, there is ample evidence that the attack on General Oveissi was planned.  First, the assassination took place in broad daylight on a busy street in Paris and was apparently perpetrated by trained assassins, *see, e.g.*, Dkt. 18-22 at 3 (explaining that Oveissi was "struck in the head by gunfire" on a "busy and prosperous shopping street" in Paris "by gunmen the police described as professional assassins").  Second, the attack followed Ayatollah Sadegh Khalkhali's pronouncement of a death sentence.  Dkt. 18-13 at 29; Dkt. 18-18 at 2 (explaining that "[t]he head of Iran's revolutionary courts said today that the deposed shah and his family are considered to be under death sentences and that anyone who assassinates them would be 'carrying out the people's verdict,'" and that "Gen. Gholam Ali Oveissi" was also "on the death list").  Moreover, as discussed above, Dr. Clawson opined that "General Oveissi was killed by persons acting at the direction and under the orders of Iranian government officials."  Dkt. 18-25 at 18.  A killing done in response to a direction or order is necessarily "deliberated" for purposes of the FSIA.

c.      Finally, the attack was perpetrated without "a prior judgment affording judicial guarantees or due process," *Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186, 202 (D.D.C.

2017); *see also Owens VI*, 864 F.3d at 770, or "under the [lawful] authority of a foreign nation,"

TVPA § 3(a).  To be sure, in a press interview, Ayatollah Sadegh Khalkhali announced that a

death sentence had been passed on General Oveissi (as well as others), stating:

> The deposed Shah, Farah [the Queen], Farideh Diba [Farah's Mother],
> Gholamreza Pahlavi, Ashraf [Shah's twin sister], Shapour Bakhtiar, General
> Azhari, Sharif Emami, General Oveisi . . . who in Iran's view are all criminals
> are condemned to death. Any Iranian who kills one of these people in foreign
> countries is considered an agent executing a court order.

Dkt. 18-13 at 29 (alterations in original).  "There is no evidence," however, "that this order was

sanctioned by any judicial body, and the order to kill a political refugee was in direct

contravention of civil guarantees recognized as indispensable to all free and civilized peoples."

*Oveissi V*, 879 F. Supp. 2d at 53.  There is absolutely no evidence—or reason to believe—that

General Oveissi was afforded any process whatsoever, much less "due process," before he was

gunned down.

      3.    *Iran's Role*

      A foreign state is not immune from suit if it either committed the extrajudicial killing or

if it provided "material support or resources for such an act if such act or provision of material

support or resources is engaged in by an official, employee, or agent of such foreign state while

acting within the scope of his or her office, employment, or agency."  28 U.S.C. § 1605A(a)(1).

      The prior *Oveissi* opinions and the Plaintiffs in this case characterize Iran's role in

General Oveissi's assassination somewhat differently.  In 2012, Judge Lamberth found that "the

assassination of General Oveissi constitutes an extrajudicial killing, undertaken by members of

Hezbollah acting as agents for defendants Iran and MOIS."  *Oveissi V*, 879 F. Supp. 2d at 53; *see

also Oveissi v. Islamic Republic of Iran*, 768 F. Supp. 2d 16, 18 (D.D.C. 2011) ("*Oveissi IV*")

("Islamic Jihad was responsible for the murder of Gholam Ali Oveissi in Paris, France, and the

agents carrying out the assassination were funded and controlled by defendant Iran through

defendant MOIS." (internal citation and quotation marks omitted)).  Judge Lamberth determined

that "Iran founded and supported Hezbollah for the purpose of advancing its own agenda,"

including by placing its own agents into Hezbollah and providing logistical support and training.

*Oveissi V*, 879 F. Supp. 2d at 53.  He concluded that "these acts plainly constitute the provision

of material support for FSIA purposes."  *Id.*

The evidence before the Court, however, suggests that Iran's role in General Oveissi's

assassination likely involved more than providing material support to Hezbollah.  Here, Shahryar

claims that Iran's "agents, employed by MOIS, carried out th[e] attack."  Dkt. 18 at 3–4.  In

other words, he claims that Iran did not simply provide "material support" for the attack but was

"direct[ly] responsibl[e]" for the assassination.  *Id.* at 4.  For support, Shahryar points to (1) a

report prepared by the Federal Research Division of the Library of Congress, which lists General

Oveissi's assassination as among those in which "MOIS has been involved," Dkt. 18-14 at 53;

(2) a report from the Iran Human Rights Documentation Center, which explains that Ayatollah

Sadegh Khalkhali announced a death sentence for General Oveissi, that the Ayatollah gave a

speech indicating that revolutionary authorities were looking for General Oveissi, that the

Government of Iran "characterized the killings as a 'revolutionary execution,'" and that Iranian

exile groups accused Iran of ordering the killings, Dkt. 18-13 at 29; (3) a *Washington Post* article

noting that "Iran described the killings" of General Oveissi and his brother "as a 'revolutionary

execution,'" Dkt. 18-15 at 2; (4) a February 8, 1984, *New York Times* article noting that although

"[n]o one immediately took responsibility for the shooting, . . . spokesmen for several Iranian

exile groups opposing the regime of Ayatollah Ruhollah Khomeini accused the Teheran [sic]

Government of ordering the assassinations in an effort to intimidate opposition organizations,"

Dkt. 18-22 at 3; (5) Dr. Clawson's report, which opines with a "reasonable degree of certainty"

that "General Oveissi was killed by persons acting at the direction and under the orders of

Iranian government officials," Dkt. 18-25 at 18; and (6) a July 31, 1985, declassified CIA report

relied on by Dr. Clawson, which concludes that "Iranian intelligence agents probably"

assassinated General Oveissi, Dkt. 18-26 at 1.

Ultimately, the Court need not decide whether Iran and MOIS provided material support

to Hezbollah (operating as the Islamic Jihad), which carried out the attack, or whether MOIS

agents carried out the attack themselves. Either way, there is abundant evidence that Iran was

responsible for the extrajudicial killings—whether by funding Hezbollah or carrying out the

attack directly—and that is all that is necessary for present purposes.[7]

4.    *Causation*

The Court must also consider whether Shahryar's injuries were "caused by" Iran's

assassination of General Oveissi or Iran's material support to a terrorist organization, which then

carried out the assassinations. 28 U.S.C. § 1605A(a)(1). Shahryar need not show that Iran

"specifically knew of or intended its support to cause" the particular attacks in question, *Owens

VI*, 864 F.3d at 798, or even that Iran's material support was a "but for" cause of their injuries,

*Kilburn*, 376 F.3d at 1128. Instead, the FSIA requires only a "showing of 'proximate cause,'"

which is satisfied if a Plaintiff can show "some reasonable connection between the act or

omission of the defendant and the damage which the plaintiff has suffered." *Id.* (quoting W.

Page Keeton *et al.*, *Prosser & Keeton on the Law of Torts* 263 (5th ed. 1984)). This inquiry thus

"contains two similar but distinct elements." *Owens VI*, 864 F.3d at 794. "First, the defendant's

actions must be a 'substantial factor' in the sequence of events that led to the plaintiff's injury."

---

[7] The Court notes that, consistent with this evidence, the D.C. Circuit has observed that "[t]he assassination of Gholam Oveissi clearly qualifies as an extrajudicial killing attributable to the Iranian government," *Oveissi II*, 573 F.3d at 840.

*Id.* (quoting *Rothstein v. UBS*, 708 F.3d 82, 91 (2d Cir. 2013)).  "Second, the plaintiff's injury must have been 'reasonably foreseeable or anticipated as a natural consequence' of the defendant's conduct."  *Id.* (quoting *Rothstein*, 708 F.3d at 91).

Often, the proximate cause inquiry addresses whether a sovereign's provision of financial (or other) support to a terrorist organization "caused" the extrajudicial killing.  *See, e.g.*, *Schwartz v. Islamic Republic of Iran*, 18-cv-1349 (RDM), 2020 WL 7042842, at *14 (D.D.C. Nov. 30, 2020) ("*Schwartz I*").  To the extent Iran itself directly killed General Oveissi, there is plainly no dispute that Iran caused the extrajudicial killing.  But, even if Iran only provided funding and other support to Hezbollah (or the Islamic Jihad), which in turn committed the assassination, the proximate cause requirement is still satisfied.  Although Shahryar has not demonstrated that Iran's provision of *specific* support led *directly* to the assassination, "establishing that type of close nexus is unnecessary, because financial support and material aid are fungible."  *Id.*  Shahryar has shown that "Iran has enjoyed a close relationship with Lebanese Hezbollah since its inception" in 1982, Dkt. 18-13 at 19, and that Iran's Quds Force and Revolutionary Guard have knowingly (and intentionally) supported terrorism by providing material support to Hezbollah and the Islamic Jihad, *id.* at 18–19.  As the evidence in the case and many other cases shows, and as Judge Lamberth wrote in 2012, "Iran founded Hezbollah for the purpose of undertaking attacks such as the 1984 assassination and funneled money to the terrorist organization through defendant MOIS, and . . . that both defendants played necessary planning, logistical and support roles leading up the horrific attack."  *Oveissi V*, 879 F. Supp. 2d at 51.  The Court, accordingly, finds that evidence establishes that either (1) Iran was directly responsible for the murders, or (2) Iran knowingly provided material support for Hezbollah's

wide-ranging terrorist activity, and that support played a "substantial factor" in General Oveissi's murder.

The remaining question is whether Shahryar's emotional-distress injuries resulting from the murder of his father were "reasonably foreseeable" or a "natural consequence" of Iran's conduct. *Owens VI*, 864 F.3d at 794. They were. Iran not only materially supported Hezbollah, but it also actively encouraged (and likely committed) General Oveissi's assassination. *See supra* II.A. General Oveissi's death and his family's overwhelming emotional pain were, by any measure, a foreseeable result of Iran's actions. *Owens VI*, 864 F.3d at 797–98; *Salzman*, 2019 WL 4673761, at *14.

There remains, however, an issue as to whether Plaintiff's claimed *economic* damages (that is, his alleged loss of a share of the property that was confiscated in 2010) were caused by the extrajudicial killing. The Court will discuss that issue separately. *See infra* III.C.

## B. Liability under the Federal Cause of Action

Having concluded that the Court possesses subject-matter jurisdiction, little else is required to show that Plaintiff is entitled to relief under the federal cause of action that Congress enacted in 2008 as part of the National Defense Authorization Act. *See* Pub. L. No. 110-181, § 1083, 122 Stat. 338–44 (2008) (codified at 28 U.S.C. § 1605A(c)). There is almost total "overlap between the elements of [§ 1605A(c)'s] cause of action and the terrorism exception to foreign sovereign immunity," *Foley*, 249 F. Supp. 3d at 205, and a plaintiff that offers proof sufficient to establish a waiver of foreign sovereign immunity under § 1605A(a) has also established entitlement to relief as a matter of federal law—with one minor exception not relevant here: the waiver of sovereign immunity turns on the status (*e.g.*, U.S. national, member of the armed forces, or employment) of the "claimant *or* the victim," while the federal cause of action turns solely on the status of the claimant. *Compare* 28 U.S.C. § 1605A(c) *with* 28 U.S.C.

§ 1605A(a)(2)(ii) (emphasis added). Because the Court has already found that Shahryar—that is, the claimant—is a U.S. national, *see supra* III.A., for the same reasons that the Court has subject-matter jurisdiction, Plaintiff has a statutory claim to relief.

## C.    Property Loss

In Count IV of the Complaint, Shahryar asserts a claim for conversion. *See* Dkt. 1 at 14–15 (Compl. ¶¶ 76–83).  As explained above, Shahryar is seeking damages to compensate him for the loss of his inheritance share of "properties belonging to General Oveissi [that] were confiscated after his assassination and were not seized as the result of the Islamic Revolution in 1978." Dkt. 19 at 2.  Those properties were confiscated in 2010 from General Oveissi's heirs in a proceeding brought before the Iran Revolutionary Court by the Mostazafan Foundation of Islamic Revolution.  Dkt. 19-4 at 3 (Adbollahi Decl. ¶ 9).  The verdict in the Iranian proceeding "was issued in absentia" because none of General Oveissi's heirs appeared to contest the confiscation.  *Id.*  Shahryar maintains that the assassination of his father "was the proximate cause of . . . [the] illegal[] confiscat[ion] . . . of General Oveissi's estate" and, thus, of Shahryar's loss of his share of that estate as one of General Oveissi's heirs.  Dkt. 19 at 3.

As Shahryar recognizes, the relief he seeks at least superficially resembles the relief that General Oveissi's grandson (and Shahryar's nephew), Amir Reza Oveissi ("Amir"), sought in this Court over a decade ago.  As noted above, in *Oveissi V*, 879 F. Supp. 2d at 58, Judge Lamberth rejected Amir's claim for damages resulting from the loss of his share of General Oveissi's estate because Amir had failed to show that General Oveissi's murder was the but-for or proximate cause of the loss of the inheritance.

Shahryar argues that Judge Lamberth's decision is distinguishable, however, for two reasons.  First, the properties at issue in that case were confiscated shortly after the Iranian revolution and prior to General Oveissi's assassination, and Judge Lamberth concluded that the

28

premise of Amir's argument—that General Oveissi might have launched a successful counter-revolution and reclaimed the properties if he had not been killed—was unduly speculative.  *Id.*  Here, in contrast, Shahryar limits his claim to the properties that were confiscated in 2010, long after General Oveissi was killed.  Dkt. 19 at 1–2.  Second, Amir invoked 28 U.S.C. § 1605A(d) in support of his claim, while Shahryar, in contrast, invokes 28 U.S.C. § 1605A(c).  *Id.*  Although Shahryar is correct in both respects, the result remains the same.

Under 28 U.S.C. § 1605A(c), a foreign state that is a sponsor of terrorism is "liable to . . . a national of the United States . . . for personal injury or death caused by [an act of . . . extrajudicial killing . . . or the provision of material support for such an act, *id.* § 1605A(a)(1)]," and, "[i]n any such action, damages may include economic damages" and other relief, *id.* § 1605A(c).  Here, Shahryar argues that the loss of his share of his family's interest in the properties that were confiscated in 2010 constitutes a form of "economic damages" that he is entitled to recover under § 1605A(c).  Dkt. 19 at 1.  So far, so good.  But Shahryar also acknowledges that he is entitled to recover only those "economic damages" that were "proximately caused by the wrongful death."  *Id.* at 6; *see also id.* at 3, 11, 17; *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 48 (D.D.C. 2016) ("Section 1605A explicitly provides that foreign state-sponsors of terrorism are liable to victims for economic losses *stemming from* injuries or death sustained as a result of the foreign state's conduct.") (emphasis added).  Shahryar's evidence and arguments, however, do not clear that hurdle.

As discussed above, to establish causation for purposes of § 1605A(c), a plaintiff must make two showings: "First, the defendant's actions must be a 'substantial factor' in the sequence of events that led to the plaintiff's injury."  *Owens VI*, 864 F.3d at 794 (quoting *Rothstein*, 708 F.3d at 91).  "Second, the plaintiff's injury must have been 'reasonably foreseeable or anticipated

as a natural consequence' of the defendant's conduct." *Id.* (quoting *Rothstein*, 708 F.3d at 91).
Plaintiff offers three theories of causation, none of which suffices even under the relaxed
standards of proof applicable in FSIA state-sponsored terrorism cases.

    Shahryar's first theory relies on the following chain of reasoning: (1) the "political
response" to General Oveissi's public assassination effectively "designated" General Oveissi as
"a high-profile potential opposition figure;" (2) that designation "prevented the family from
safely returning to Iran to visit or occupy the property;" and (3) the family's absence from Iran
led to the confiscation order, which "specifically note[d]" that the property had "remained vacant
and unused by General Oveissi and his heirs." Dkt. 19 at 8–9. Even in the context of a default
judgment, however, Shahryar has failed to proffer evidence sufficient to carry his burden with
respect to two of these premises, which are difficult to reconcile with common sense.

    First, the Court is unpersuaded that General Oveissi's status as a high-profile opposition
figure was the result of his assassination. To the contrary, the evidence before the Court shows
that General Oveissi was a well-known and controversial figure long before his assassination.
He "was a four-star general of the Iranian Imperial Army under the . . . Shah of Iran before the
1979 revolution," who fled Iran "[i]n 1978 at the height of the uprising against the Shah," and
was granted political asylum in the United States. Dkt. 14-8 at 2–3 (Sharareh Decl. ¶¶ 2–3).
After the Shah fled Iran and Ayatollah Khomeini returned from exile, "[t]he new regime asked
the U.S. government to extradite the Shah and [General Oveissi] back to Iran." *Id.* at 34
(Sharareh Decl. ¶ 4). According to a 1980 *Washington Post* article, General Oveissi was "the
most important ex-general in the exile movement." Dkt. 14-14 at 2. Among other things, he is
reported to have "received substantial financial backing from the Shah's family[,] ran an anti-

clerical radio station based in Iraq," and "claimed to have recruited a cadre of 7,000 retired

military officers and 90,000 volunteers" to his counterrevolutionary "cause." Dkt. 14-15 at 29.

Second, and for similar reasons, the Court is unpersuaded that the Oveissi family

declined to return to Iran because of the assassination. Although the assassination undoubtedly

heightened the family's fear for their safety, nothing in the record even remotely suggests that

the family would have felt safe to return to Iran had the Iranian government refrained from

plotting, supporting, or carrying out the assassination. The family fled Iran and applied for and

received asylum in the United States for good reason. Dkt. 14-8 at 2–3 (Sharareh Decl. ¶ 3).

Not only had General Oveissi served in the overthrown regime, but he had also "deploy[ed]

tanks on the streets of [Tehran] to quell popular unrest against the Shah" in 1977, and "earned

. . . the sobriquet 'the butcher of Tehran.'" Dkt. 14-15 at 28. Moreover, on Shahryar's own

telling, in order to sue Iran in the Islamic Revolutionary Court, he would have to obtain Iranian

citizenship and an Iranian passport and to then travel to Iran, where he would likely be

prosecuted "because he is the family of General Oveissi who was the most hated enemy of the

revolution." Dkt. 17 at 13. Far from turning on his father's assassination, it seems more likely

that he would have faced arrest and persecution if his father—who was one of the leading

opposition figures—remained alive. In any event, Shahryar has failed to proffer any evidence

even suggesting that he or any other member of his family would have felt safe returning to Iran

but-for his father's assassination in 1984.

Shahryar's second theory fares no better. He argues that the causation requirement

should be relaxed in the present context because General Oveissi's assassination constituted an

"intentional tort." Dkt. 19 at 10. In particular, he invokes Section 33 of the *Restatement (Third)*

*of Torts*, which provides that "[a]n actor who intentionally causes harm is subject to liability for

that harm even if it was unlikely to occur" and "is subject to liability for a broader range of harms than the harms for which the actor would be liable if only acting negligently."  Consistent with the notion that the FSIA requires courts to "find the law, not to make it," *Bettis v. Islamic Republic of Iran*, 315 F.3d 325, 338 (D.C. Cir. 2003), the D.C. Circuit has embraced "state reporters, the Restatement of Torts, and other respected treatises" as "well-established statements of common law" as tools to help identify the governing tort law principles in FSIA cases, *Fraenkel v. Islamic Republic of Iran, Ministry of Foreign Affs.*, 892 F.3d 348, 353 (D.C. Cir. 2018).

But even though the *Restatement* is at times helpful in understanding and applying the FSIA, this is not such a case.  The state-sponsored terrorism exception to the FSIA limits the waiver of sovereign immunity to cases in which the terrorist act—here, the extrajudicial killing—"caused" the "money damages [that] are sought against [the] foreign state," 28 U.S.C. § 1605A(a)(1); *see also id.* § 1605A(c).  "Under long-established law," the FSIA "requires 'some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered.' " *Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 85 (D.D.C. 2018) (citing *Kilburn*, 376 F.3d at 1128).  Similarly, this Court has Article III jurisdiction to grant relief only if the plaintiff has suffered a concrete and particularized injury in fact that bears "a causal connection" to the tortious conduct, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  The Court does not have the authority to relax these requirements and to conclude, without evidence of a causal connection, that Plaintiff lost his inheritance because of his father's assassination.

Nor, for that matter, does the *Restatement* suggest otherwise.  Although Plaintiff is correct that the *Restatement* relaxes the proximate causation standard for certain intentional torts,

the final sentence of Section 33 of the *Restatement,* which Plaintiff does not cite, makes clear that the standard is not obsolete. It provides: "Notwithstanding [s]ubsections (a) and (b)"—that is, the provisions that Plaintiff invokes—"an actor who intentionally or recklessly causes harm is *not* subject to liability for harm the risk of which was not increased by the actor's intentional or reckless conduct." *Restatement (Third) of Torts* § 33(c) (emphasis added). By way of example, the *Restatement* notes that a tortfeasor who shoots "at A with intent to do A harm," but who misses A and hits B, should be held liable for intentionally shooting B in light of "the highly culpable nature of the tortfeasor's act," even though under the usual "scope of the risk" standard, the resulting harm to B would not be "conceived as the harm intended or substantially certain to occur," *Restatement (Third) of Torts* § 33, cmt. a. In this example, there is no question that the tortfeasor's shooting—his intentional conduct—although not intended or likely to cause injury to B, still increased the risk of that injury occurring. As the *Restatement* further explains, "the moral culpability of an intentional or reckless tortfeasor is a relevant and important factor to take into account in determining the scope of liability." *Id.* § 33 cmt. b. In other words, although intentional conduct can broaden the scope of a tortfeasor's liability to include unintended or unlikely harm, the intentional conduct—in this case, General Oveissi's assassination—must have still increased the risk of the resulting harm. Understood in this light, the standard set forth in Section 33 of the *Restatement* is entirely consistent with the decades of precedent from the D.C. Circuit and this Court applying a flexible—but meaningful—proximate cause test to FSIA cases, and this Court sees no reason to depart from that well-established standard. Here, the record is devoid of evidence suggesting that General Oveissi's assassination—as opposed to his association with the deposed Shah and his counterrevolutionary activity—increased the risk that

Shahryar or any other member of the Oveissi family would decline to return to Iran to assert an interest in the confiscated property.

Plaintiff's third theory also fails. He argues that "the extrajudicial killing of General Oveissi is part of a continuous succession of events that caused the continued expropriation of General Oveissi's property." Dkt. 19 at 16. The mechanics of this theory are not crystal clear. He seems to draw on the principle of joint and several liability in torts, under which "separate but related acts" by "one or more individuals" can, together, "directly cause a single injury" such that "either or both wrongdoers" can be held responsible "for the whole injury." *Id.* at 17. But, as Plaintiff himself points out, the "wrongdoer" in this case (Iran) is the same with respect to the extrajudicial killing and the confiscation of property. *Id.* at 17. So, the relevance of principles of joint and several liability is far from clear. Plaintiff continues by asserting that the "former act (General Oveissi's death) was required to achieve the latter act (seizure of his properties in the 2010 Order)." *Id.* On Plaintiff's telling, "the latter did not break the chain of proximate causation but continued it." *Id.* From there, however, this theory collapses back into the first one, discussed above, and Shahryar once again suggests that General Oveissi's assassination caused the threat to his family's safety, which prevented them from returning to Iran to assert their property rights. *Id.* at 18. For the same reasons above, that theory is unsupported by the record.

Taken as a whole, the record shows that the Oveissi family sought political asylum in the United States years before General Oveissi's assassination and that they are enemies of the state and political exiles. Regardless of whether General Oveissi was ever targeted for assassination, it borders on the inconceivable to think that the family would ever have returned to Iran to state their claim to these properties—particularly since they never even knew that the confiscation

proceedings were underway, Dkt. 14-3 at 10 (Shahryar Decl. ¶ 17).  Perhaps, had General

Oveissi lived, he would have "lead a successful counter-revolution against the Iranian regime

during or after 1984 and reclaimed his property—which [P]laintiff then could have inherited."

*Oveissi V*, 879 F. Supp. 2d at 58.  But that "is only one of an unlimited number of alternative

histories that could have emerged had General Oveissi lived."  *Id.*  The type of "historical

revisionism" required to find that the extrajudicial killing prevented General Oveissi from

leading a successful counter-revolution, allowing his family to live safely in Iran (and, therefore,

in a position to state a claim to any property) is far too speculative.  *Id.*

The Court, accordingly, finds that Shahryar has failed to show that he is entitled to

receive compensation pursuant to the state-sponsored terrorism exception to the FSIA for Iran's

2010 confiscation of his father's remaining property in the country.

**D.      Personal Jurisdiction**

Next, the Court finds that it has personal jurisdiction over Iran.  Under the FSIA, the

Court has personal jurisdiction over a foreign state "as to every claim for relief over which the

[Court] ha[s] jurisdiction . . . where service has been made under section 1608."  28 U.S.C.

§ 1330(b).  Thus, "[i]n order to sue a foreign state or one of its political subdivisions, a plaintiff

must effect service in compliance with" 28 U.S.C. § 1608(a).  *Barot v. Embassy of the Republic*

*of Zambia*, 785 F.3d 26, 27 (D.C. Cir. 2015).

Section 1608(a) sets forth four methods of service in descending order of preference:

(1)  by delivery of a copy of the summons and complaint in accordance with any
     special arrangement for service between the plaintiff and the foreign state
     or political subdivision; or

(2)  if no special arrangement exists, by delivery of a copy of the summons and
     complaint in accordance with an applicable international convention on
     service of judicial documents; or

>      (3)  if service cannot be made under paragraphs (1) or (2), by sending a copy of
>           the summons and complaint and a notice of suit, together with a translation
>           of each into the official language of the foreign state, by any form of mail
>           requiring a signed receipt, to be addressed and dispatched by the clerk of
>           the court to the head of the ministry of foreign affairs of the foreign state
>           concerned; or
>
>      (4)  if service cannot be made within 30 days under paragraph (3), by sending
>           two copies of the summons and complaint and a notice of suit, together with
>           a translation of each into the official language of the foreign state, by any
>           form of mail requiring a signed receipt, to be addressed and dispatched by
>           the clerk of the court to the Secretary of State in Washington, District of
>           Columbia, to the attention of the Director of Special Consular Services—
>           and the Secretary shall transmit one copy of the papers through diplomatic
>           channels to the foreign state and shall send to the clerk of the court a
>           certified copy of the diplomatic note indicating when the papers were
>           transmitted.

28 U.S.C. § 1608(a).

The first two mechanisms of effecting service—by delivery of the summons and complaint either "in accordance with any special arrangement for service between the plaintiff and the foreign state" under § 1608(a)(1) or "in accordance with an applicable international convention on service of judicial documents" under § 1608(a)(2)—were unavailable to Plaintiffs in this case. No "special arrangement" governs service between Plaintiffs and Iran, and "Iran is not party to an 'international convention on service of judicial documents.'" *Ben-Rafael v. Islamic Republic of Iran*, 540 F. Supp. 2d 39, 52 (D.D.C. 2008) (citations omitted).

As a result, Plaintiffs attempted service under the third alternative, which requires service by mail from the clerk of the court to the head of the ministry of foreign affairs of the foreign state. 28 U.S.C. § 1608(a)(3). On January 16, 2020, Plaintiffs initiated service to Iran under § 1608(a)(3). *See* Dkt. 5. The Clerk of Court mailed the relevant documents to Iran on January 24, 2020. *See* Dkt. 6. On March 9, 2020, Plaintiffs notified the Court that "service was not effected within thirty (30) days under 28 U.S.C. § 1608(a)(3)." Dkt. 7-1 at 1.

Finally, Plaintiffs served Defendants under § 1608(a)(4).  *See* Dkt. 8.  That provision requires service by mail from the clerk of court to the Secretary of State, who must then transmit the required materials through diplomatic channels to the foreign state.  28 U.S.C. § 1608(a)(4).  The Department of State must then send "the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted."  *Id.*  Plaintiffs requested service pursuant to § 1608(a)(4) on March 9, 2020.  Dkt. 7.  The Clerk mailed the materials to the State Department on March 10, 2020.  *See* Dkt. 9.  On September 17, 2020, the Department of State notified the Clerk that the documents had been served on Iran.  Dkt. 10.  Because the United States does not maintain diplomatic relations with the Government of Iran, the documents were transmitted to the Embassy of Switzerland in Iran, which then transmitted the materials to the Iranian Ministry of Foreign Affairs on August 19, 2020.  *Id.* at 1.  The Swiss Embassy reported that the Iranian Ministry "refused" to accept the documents.  Dkt. 18-17 at 9.  After the Islamic Republic of Iran failed to respond, the Clerk entered a default.  *See* Dkt. 12.

Plaintiffs' efforts to serve Iran satisfied the requirements of § 1608(a)(4).  Because Plaintiffs accomplished service under 28 U.S.C. § 1608(a)(4) on the Islamic Republic of Iran, the Court possesses personal jurisdiction over Defendant.  *See* 28 U.S.C. § 1330(b).

## E.    Quantum of Damages

Plaintiff requests non-economic damages of $10,000,000; economic damages of $53,795,010; and punitive damages of $300,000,000.  Dkt. 18 at 27.  As explained, *see supra* III.C, Plaintiff has failed to establish his entitlement to economic damages under the FSIA's

terrorism exception.[8]  Accordingly, the Court is left to determine Plaintiff's non-economic and punitive damages.

    1.    *Non-economic damages*

    "Solatium claims are typically brought by family members who were not present or injured themselves."  *Cohen v. Islamic Republic of Iran*, 238 F. Supp. 3d 71, 84 (D.D.C. 2017) ("*Cohen I*").  An award of solatium damages is intended to compensate for "the mental anguish, bereavement and grief that those with a close personal relationship to a decedent experience as the result of the decedent's death, as well as the harm caused by the loss of the decedent."  *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 22 (D.D.C. 2009).  The state-sponsored terrorism exception to the FSIA expressly contemplates the award of solatium damages to the close relatives of terrorism victims.  *See* 28 U.S.C. § 1605A(c).  There exists a "'presumption' that family members in direct lineal relationship 'suffer compensable mental anguish and testimony proving a close relationship will usually be sufficient to sustain an award of solatium damages.'"  *Kaplan v. Hezbollah*, 213 F. Supp. 3d 27, 38 (D.D.C. 2016) (quoting *Kim v. Democratic People's Republic of Korea*, 87 F. Supp. 3d 286, 290 (D.D.C. 2015)) (internal alterations omitted).

    "Solatium damages, like damages for pain and suffering, are by their very nature unquantifiable."  *Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 72 (D.D.C. 2015).  But, as with the latter, prior FSIA decisions have identified certain baselines that help ensure that

---

[8] In their complaint, Plaintiffs reference other types of economic damages, such as for lost profits and lost earnings.  *See* Dkt. 1 at 15 (Compl. ¶¶ 84–90).  In Shahryar's second motion for default damages, however, his request for economic damages is limited to the losses resulting from the confiscation of his father's properties in Iran.  *See* Dkt. 18 at 23–24 (cross-referencing the supplemental briefing on economic damages "regarding the estate of the General Oveissi"); *see also* Dkt. 19 at 34 (requesting "economic damages equal to the value of the los[t] inheritance at the time of confiscation of [General Oveissi's] properties in 2010").

similarly situated victims receive comparable awards. Specifically, decisions in this district have "established two primary frameworks, sometimes called the '*Peterson II*' or '*Heiser*' frameworks," which "provide a baseline of $8 million for spouses, $5 million for parents and children, and $2.5 million for siblings." *Cabrera v. Islamic Republic of Iran*, No. 18-cv-2065, 2022 WL 2817730, at *47 (D.D.C. July 19, 2022). These amounts are merely guideposts, and the Court must determine the appropriate award depending on the specific circumstances presented. *See Fraenkel*, 892 F.3d at 361–62. As relevant here, prior decisions have increased solatium damages when the evidence demonstrates that the plaintiff has experienced even more extreme effects of the loss of a loved one than experienced by other victims of terrorism who have suffered similar losses. *See, e.g.*, *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 85–86 (D.D.C. 2010); *Stethem v Islamic Republic of Iran*, 201 F. Supp. 2d 78, 90–91 (D.D.C. 2002).

Here, the record demonstrates that the loss of Shahryar's father caused him profound emotional and psychological harm. *See supra* II.B.1. As noted, $5 million is the baseline amount for the children of parents who were killed. The Court determines that several factors justify an upward departure from this number, albeit not as high as Plaintiff requests.

A comparison to the case brought by Amir, General Oveissi's grandson, is useful. In that case, the Court concluded that General Oveissi was, in effect, a "second father" to Amir, *Oveissi v. Islamic Republic of Iran ("Oveissi III")*, 768 F. Supp. 2d 1, 13 (D.D.C. 2010), and, accordingly, applied the $5 million baseline as though they were parent and child, *Oveissi IV*, 768 F. Supp. 2d at 27. The Court then considered a number of factors that justified a higher award: Amir was particularly close to his grandfather; General Oveissi's death was sudden and unexpected; the family was uprooted from their home and forced to live under the threat of

death; Amir experienced significant psychological challenges as a child; and he continued to suffer effects into adulthood. *Id.* at 28–31. The Court determined that an award of $7.5 million in solatium damages was warranted. *Id.* at 30.

Shahryar's and Amir's claims for an upward departure are nearly identical: Shahryar and Amir were approximately the same age when General Oveissi was murdered, *see id.* at 28 (noting that Amir was less than six years old); General Oveissi's brutal murder on the streets of Paris came as an extraordinary shock to the entire family; Shahryar was also forced to uproot his life and live in a state of fear of retribution; Shahryar suffered significant mental health and psychological damage in his childhood as a result of the assassination; and Shahryar continues to experience detrimental effects of that trauma to this day. Dkt. 1 at 10 (Compl. ¶¶ 42–43). Accordingly, the Court agrees with Judge Lamberth that, in such a case, an upward departure to $7.5 million is warranted.

Plaintiff argues that the Court should depart up to $10 million on the theory that the difference between a child and a grandchild is meaningful. Dkt. 18 at 21. Because Judge Lamberth found that the relationship between Amir and General Oveissi was akin to a parent-child relationship, however, and because Amir's and Shahryar's experiences were otherwise similar, the Court is unpersuaded that an additional 33% increase in non-economic damages is warranted. The baseline of $5 million starts with the premise that the death of a parent due to an act of terrorism is, in and of itself, horrific, and an upward adjustment from that amount must be premised on consequences that make a brutal murder more severe than other brutal murders. Although the Court must consider how Shahryar's injuries compare to Amir's, it must also avoid creating undue inconsistencies between Shahryar's case and the hundreds (or thousands) of other cases involving extrajudicial killings of a plaintiff's loved ones.

2.      *Punitive damages*

Finally, Plaintiff also seeks punitive damages in an amount equal to those received by Amir: $300,000,000.  *See* Dkt. 18 at 27.  Punitive damages "serve to punish and deter the actions for which they [are] awarded," *Valore*, 700 F. Supp. 2d at 87, and are expressly contemplated by the FSIA, *see* 28 U.S.C. § 1605A(c).

In determining the amount of punitive damages to award, courts typically consider four factors: "(1) the character of the defendants' act, (2) the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants."  *Fritz v. Islamic Republic of Iran*, 324 F. Supp. 3d 54, 65 (D.D.C. 2018) (quotations marks and citations omitted).  These factors militate in favor of a large award here.  As to the first factor, assassinating a political rival by gunfire on a Paris street is nothing short of "heinous."  *See Oveissi V*, 879 F. Supp. 2d at 56 ("The nature of the defendants' act and the nature and extent of the harm defendants intentionally caused are among the most heinous the Court can fathom.").  As to the second factor, as explained, Plaintiff has suffered significant harm:  A young child's father was shot and killed, leaving that child in a near-constant state of fear for many years thereafter.  Here, moreover, it is likely that the murder had a chilling effect on a large swath of the Iranian community in exile around the world.  "As to deterrence and wealth, Iran is a foreign state with substantial wealth and has expended significant resources sponsoring terrorism."  *Id.*  And "because Iran's provision of material support to militant groups for the purpose of harming Americans is 'part of a longstanding pattern and policy, . . . the need for deterrence [is] clear.'"  *Schwartz v. Islamic Republic of Iran*, No. 18-cv-1349, 2022 WL 1567358, at *4 (D.D.C. May 18, 2022) ("*Schwartz II*") (quoting *Hekmati v. Islamic Republic of Iran*, 278 F. Supp. 3d 145, 166 (D.D.C. 2017)).

In practice, determining the precise amount has generally involved applying a multiplier to a base amount (referred to as the "multiplicand"). *See Harrison v. Republic of Sudan*, 882 F. Supp. 2d 23, 50 (D.D.C. 2012). As to the multiplicand, some decisions have utilized the defendant's annual expenditures on terrorist activities, *see, e.g.*, *Valore*, 700 F. Supp. 2d at 88, while others have used the amount of compensatory damages already awarded, *see, e.g.*, *Gill v. Islamic Republic of Iran*, 249 F. Supp. 3d 88, 106 (D.D.C. 2017), and still others have considered both these factors together, *see, e.g.*, *Hekmati*, 278 F. Supp. 3d at 166–67. But where, as here, "[p]laintiffs have not provided sufficient evidence as to Iran's expenditures" and the underlying acts are not "as 'exceptionally' deadly or substantial as those in cases where the total-expenditures multiplicand has been used," "the appropriate multiplicand is the total compensatory damages already awarded." *Hamen v. Islamic Republic of Iran*, 407 F. Supp. 3d 1, 10 (D.D.C. 2019); *cf. Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 80 (D.D.C. 2010) (using the total-expenditures multiplicand for claims arising from the Beirut bombing where 241 Americans were killed).

This leaves, then, the question of the appropriate multiplier. Courts in this jurisdiction have frequently used a multiplier between one and five depending on various factors, including, among other things, whether the case involved exceptional circumstances, the perceived deterrence effect, the nexus between the defendant and the injurious acts, and the evidence plaintiffs presented regarding the defendant's funding for terrorist activities. *See, e.g.*, *Moradi*, 77 F. Supp. 3d at 73 (multiplier of one where Iranian authorities directly detained and tortured, but did not kill, plaintiff); *Hekmati*, 278 F. Supp. 3d at 167 (same); *Fritz*, 324 F. Supp. 3d at 65 (multiplier of two for a case involving hostage-taking and killing by terror organization the defendant supported); *Harrison*, 882 F. Supp. at 50–51 (multiplier of three for the bombing of

the U.S.S. Cole where plaintiffs presented no evidence relating to defendant's expenditures on terrorist activities); *Haim v. Islamic Republic of Iran*, 784 F. Supp. 2d 1, 14 (D.D.C. 2011) (multiplier of three for a suicide bombing that killed eight and wounded dozens); *Valore*, 700 F. Supp. 2d at 88–89 (multiplier of five for victims of the Beirut bombing where plaintiffs presented expert testimony on the deterrence effect of punitive damages).

Turning to the case at hand, the Court concludes that a multiplier of four is appropriate. *See Est. of Henkin v. Islamic Republic of Iran*, No. 18-cv-1273, 2023 WL 3319425, at *4 (D.D.C. May 9, 2023) (stating that a factor of three is the usual practice). This Court has applied a multiplier of two in cases in which Iran provided material support to a terrorist organization that abducted, tortured, and later executed the plaintiff. *See Schwartz II*, 2022 WL 1567358, at *5; *Fritz*, 324 F. Supp. 3d at 58; *see also Hamen*, 407 F. Supp. 3d at 11. Several factors counsel in favor of applying a higher multiplier here. First, Iran's connection to General Oveissi's assassination was more direct than the usual case; it seems likely that Iran did not merely fund a terrorist organization, knowing that its support would be used to commit acts of terrorism, but called for General Oveissi's execution and then carried out its own directive. *See supra* III.3. Second, a higher punitive damages award is appropriate due to the premeditated and political nature of the attack on the streets of Paris, over 2,500 miles from Tehran. That attack conveyed both the reach and ferocity of the Iranian regime's war on dissent, sending the signal that no one, anywhere, was safe. The Court will, accordingly, award Plaintiff punitive damages in an amount equal to four times his compensatory damages: $30,000,000.

Plaintiff urges the Court to award $300,000,000 in punitive damages, the amount awarded to General Oveissi's grandson, Amir. That award is from 2012, however, *Oveissi V*, 879 F. Supp. 2d at 56–57, and courts in this jurisdiction have since developed the above-

referenced method for calculating punitive damages in FSIA cases, *see, e.g.*, *Est. of Henkin*, 18-cv-1273, 2023 WL 3319425, at *4 (explaining this Court's methodologies for calculating punitive damages); *Bernhardt v. Islamic Republic of Iran*, No. 18-cv-2739, 2023 WL 2598677, at *18 (D.D.C. Mar. 22, 2023) (same). Plaintiff failed even to address these methodologies in his motion for default, and the Court sees no reason to deviate from them here.

## CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that the motion for default judgment, Dkt. 18, is **GRANTED** in part and **DENIED** in part. It is further **ORDERED** that Plaintiff Shahryar Oveissi shall be awarded $7,500,000 in non-economic damages and $30,000,000 in punitive damages for a total award of $37,500,000.

**SO ORDERED**.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date: August 15, 2025

44